1  CHAVEZ & GERTLER LLP
   MARK A. CHAVEZ (Bar No. 90858)
2  KIM E. CARD (Bar No. 147779)
   42 Miller Avenue
3  Mill Valley, California 94941
   Telephone:  (415) 381-5599
4  Facsimile:  (415) 381-5572
   kim@chavezgertler.com
5
   INTERNATIONAL LABOR RIGHTS FUND
6  TERRY COLLINGSWORTH
   733 15th Street, N.W., Suite 920
7  Washington, D.C.  20005
   Telephone:  (202) 347-4100
8  Facsimile:  (202) 347-4885
9  DANIEL M. KOVALIK
   Five Gateway Center, Rm. 807
10 Pittsburgh, Pennsylvania  15222
   Telephone:  (412) 521-2826
11 Facsimile:  (412) 562-2574
12 Attorneys for Plaintiffs
   BARBARA BAUMAN, et al.
13
                    UNITED STATES DISTRICT COURT
14
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
15
16 BARBARA BAUMAN, on behalf of herself )   Case No.:  CV 04-00194 RMW
   and as heir of her son, OSCAR ALBERTO )
17 ALVAREZ BAUMAN; GREGORY            )
   GRIECO, on behalf of himself and as heir of )
18 his brother MIGUEL GRIECO; JOSEFINA )
   NUNEZ, on behalf of herself and as heir of )   FIRST AMENDED COMPLAINT FOR
19 her husband, DIEGO NUNEZ; GABRIELE )   DAMAGES AND DECLARATORY
   NUNEZ, MIRIAM NUNEZ and SILVIA   )   RELIEF FOR:
20 NUNEZ, on behalf of themselves and as )
   heirs of their father, DIEGO NUNEZ;    )   1.   Extra-Judicial Killing
21 EMILIO GUILLERMO PESCE, on behalf )   2.   Torture
   of himself and as heir of his brother,    )   3.   Crimes Against Humanity
22 ESTEBAN A. REIMBER; MIRTA         )   4.   Cruel, Inhuman and Degrading
   HAYDEE ARENAS, on behalf of herself )        Treatment
23 and as heir of her brother , ALBERTO   )   5.   Violation of California's Wrongful
   FRANCISCO ARENAS; GRACIELA       )        Death Statute
24 GIGENA, on behalf of herself and as heir of )   6.   Intentional Infliction of Emotional
   her husband, ALBERTO GIGENA;        )        Distress
25 GUILLERMO ALBERTO GIGENA and   )
   NURIA GIGENA, on behalf of themselves )   DEMAND FOR JURY TRIAL
26 and as heirs of their father, ALBERTO   )
   GIGENA; AMELIA SCHIAFFO, on behalf )
27 of herself and as heir of her husband    )
   FERNANDO OMAR DEL CONNTE;       )
28 ELBA LEICHNER, on behalf of herself and )

1   as heir of her son JORGE LEICHNER;   )
    ANUNCIACION SPALTRO DE     )
2   BELMONTE, on behalf of herself and as   )
    heir of her husband HECTOR BELMONTE; )
3   HECTOR RATTO; EDUARDO     )
    OLASIREGUI; RICHARD MARTIN   )
4   HOFFMAN; EDUARDO ESTIVILLE,   )
    ALFREDO MANUEL MARTIN; JUAN   )
5   JOSE MARTIN; JOSE BARREIRO; and   )
    ALEJANDRO DAER,     )

6           Plaintiffs,     )

7           vs.     )

8   DAIMLERCHRYSLER AG and DOES 1   )
9   through 50, inclusive,     )

10           Defendant.   )

I.   NATURE OF ACTION

1.      This case involves the forced disappearance and presumed murders of Oscar Alberto Alvarez Bauman, Miguel Grieco, Diego Nuñez, Estaban A. Reimer, Alberto Francisco Arenas, Alberto Gigena, Fernando Omar del Connte, Jorge Leichner and Hector Belmonte -- all workers and trade unionists at the Mercedes Benz Argentina ("MBA") plant in Gonzalez-Catan, Argentina.   The disappearances of these individuals were carried out by state security forces acting under the direction of and in collaboration with MBA -- now known as DaimlerChrysler Argentina ("DCA"), a division or wholly-owned subsidiary of the multi-national corporation DaimlerChrysler Aktiengesellschaft, also known as DaimlerChrysler AG, "DCAG" or "Defendant").    Close relatives of these disappeared individuals bring this action on behalf of themselves for the injuries, including pain and suffering, they have endured as a result of these disappearances, and as heirs of the disappeared.  This case also involves the kidnapping, detention and torture of Plaintiffs Hector Ratto, Eduardo Olasiregui, Ricardo Martin Hoffman, Eduardo Estivill, Alfredo Manuel Martin, Juan Jose Martin, Jose Barreiro and Alejandro Daer -- workers and trade unionists at the same MBA plant.   The kidnapping, detention and torture of these Plaintiffs were carried out by state security forces acting under the direction of and with material assistance from MBA.

2.      The disappearance and presumed extra-judicial killings of the aforementioned missing individuals as well as the kidnapping, detention and torture of the aforesaid Plaintiffs were committed in contravention of the law of nations, and as such, are actionable under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. §1350 and the Torture Victims Protection Act ("TVPA"), 28 U.S.C. §1350, Note.   Plaintiffs bring this action against Defendant DCAG, of which DCA, the successor-in-interest of MBA,  is a division, making DCAG the responsible corporate entity for the acts of its own employees. Alternatively, DCA is a wholly-owned subsidiary that DCAG so dominates and controls that DCA is its alter ego.   High-ranking employees/officials of MBA, including Director of Legal Affairs Ruben Pablo Cueva, Human Resources Director Pedro de Elias and Director of Production Juan Tasselkraut conspired with, directed and aided and abetted state security forces in carrying out the human rights violations

1

alleged herein.

## II.   PARTIES

### Category I Plaintiffs

3.      Plaintiff Barbara Bauman is a citizen and permanent resident of Argentina.  She is the mother and surviving heir of Oscar Alberto Alvarez Bauman.  Oscar Alberto Alvarez Bauman had been an employee of MBA and was an independent union activist.  He was disappeared along with his wife Monica on August 4, 1977.  Plaintiff Barbara Bauman sues on behalf of herself for the injuries, including pain and suffering, she has endured as a result of the loss of her son.  She also brings this action on behalf of her son, as his heir, for the injuries he suffered as a result of his kidnapping, torture, disappearance and presumed murder.

4.      Gregorio Grieco is a citizen and permanent resident of Argentina.  He is the brother and surviving heir of Miguel Grieco.  Miguel Grieco had been an employee of MBA and an independent union activist.  He was disappeared by state security forces on December 14, 1976.  Gregorio Grieco sues on behalf of himself for the injuries, including pain and suffering, he has endured as a result of the loss of his brother.  He also brings this action on behalf of his brother, Miguel Grieco, as the latter's heir, for the injuries the latter suffered as a result of his kidnapping, torture, disappearance and presumed murder.

5.      Josefina Nuñez is a citizen and permanent resident of Argentina.  She is the surviving wife of Diego Nuñez, an MBA employee who was disappeared by state security forces on August 13, 1977.  Josefina Nuñez sues on behalf of herself for the injuries, including pain and suffering, she has endured as a result of the loss of her husband.  She also brings this action on behalf of her husband, Diego Nuñez, as the latter's heir, for the injuries the latter suffered as a result of his kidnapping, torture, disappearance and presumed murder.

6.      Gabriele Nuñez, Miriam Nuñez and Silvia Nuñez are citizens and permanent residents of Argentina.   They are surviving daughters of Diego Nuñez, who was disappeared on August 13, 1977.  They sue on behalf of themselves, individually, for the injuries, including pain and suffering, they have endured as a result of the loss of their father.   In addition, they bring this action on behalf of their father, Diego Nuñez, as the latter's heir, for the injuries he

suffered as a result of his kidnapping, torture, disappearance and presumed murder.

7.     Emilio Guillermo Pesce is a citizen and permanent resident of Argentina.   He is the surviving brother of Esteban A. Reimer, an MBA employee who was disappeared by state security forces on January 5, 1977.   He sues on behalf of himself for the injuries, including pain and suffering, that he has endured as a result of the loss of his brother.   He also brings this action on behalf of his brother, Esteban A. Reimer, as the latter's heir, for the injuries he suffered as a result of his kidnapping, torture, disappearance and presumed murder.

8.     Mirta Haydee Arenas is a citizen and permanent resident of Argentina.   She is the surviving sister of Alberto Francisco Arenas who was disappeared by state security forces on August 19, 1977.  She sues on behalf of herself for the injuries, including pain and suffering, that she has endured as a result of the loss of her brother.   She also brings this action on behalf of her brother, Alberto Francisco Arenas, as the latter's heir, for the injuries he suffered as a result of his kidnapping, torture, disappearance and presumed murder.

9.     Graciela Gigena is a citizen and permanent resident of Argentina.  She is the surviving wife of Alberto Gigena who was disappeared by state security forces on August 13, 1977.  She sues on behalf of herself for the injuries, including pain and suffering, that she has endured as a result of the loss of her husband.  She also brings this action on behalf of her husband, Alberto Gigena, as the latter's heir, for the injuries he suffered as a result of his kidnapping, torture, disappearance and presumed murder.

10.     Guillermo Alberto Gigena and Nuria Gigena are citizens and permanent residents of Argentina.  They are the children of Alberto Gigena who was disappeared by state security forces on August 13, 1977.  They bring this case on behalf of themselves for the injuries, including pain and suffering, that they endured as result of the loss of their father.  They also bring this action on behalf of Alberto Gigena, as the latter's heir, for the injuries he suffered as a result of his kidnapping, torture, disappearance and presumed murder.

11.     Amelia Schiaffo is a citizen and permanent resident of Argentina.   She is the surviving wife of Fernando Omar Del Connte who was disappeared on August 12, 1977.  She brings this action on behalf of herself for the injuries, including pain and suffering, that she

3

endured as a result of the loss of her husband.  She also brings this case on behalf of Fernando Omar Del Connte, as the latter's heir, for the injuries he suffered as a result of his kidnapping, torture, disappearance and presumed murder.

12.     Elba Leichner is a citizen of Chile and a permanent resident of Argentina.  She is the mother of Jorge Leichner who was disappeared on August 14, 1977.   She brings this action on behalf of herself for the injuries, including pain and suffering, that she endured as a result of the loss of her son.  She also brings this case on behalf of Jorge Leichner, as the latter's heir, for the injuries he suffered as a result of his kidnapping, torture, disappearance and presumed murder.

13.     Anunciacion Spaltro de Belmonte is a citizen and permanent resident of Argentina.   She is the wife of Hector Belmonte, an MBA employee and union activist who was disappeared on August 13, 1977.  She brings this action on behalf of herself for the injuries, including pain and suffering, that she endured as a result of the loss of her husband. She also brings this case on behalf of Hector Belmonte, as the latter's heir, for the injuries he suffered as a result of his kidnapping, torture, disappearance and presumed murder.

<u>Category II Plaintiffs</u>

14.     Alfredo Manuel Martin is a citizen and permanent resident of Argentina. Alfredo Martin was kidnapped, detained and tortured on December 14, 1976 by state security forces and Ruben Lavallen, a police station Chief.  Alfredo Martin brings this action on behalf of himself for the damages he suffered as a result of his kidnapping, detention and torture.

15.     Hector Ratto is a citizen and permanent resident of Argentina.  On August 12, 1977, Hector Ratto was detained by security forces at the MBA plant in Gonzalez Catan and brought by these forces to an army barracks in Campo de Mayo and then transferred soon thereafter to a police station where he was summarily and arbitrarily imprisoned for approximately eighteen months.   During his time in captivity, Hector Ratto was subject to extreme forms of torture, including electroshocking.  Hector Ratto brings this case on behalf of himself for the damages he suffered as a result of his arbitrary detention and torture.

16.     Juan Jose Martin is a citizen and permanent resident of Argentina.  Juan Jose

1   Martin was kidnapped in the Gonzalez-Catan factory of MBA on April 29, 1976, and brought

2   to the police precinct in San Justo where he was detained and tortured for 19 days.  Juan Jose

3   Martin brings this case on behalf of himself for the damages he suffered as a result of his

4   kidnapping, arbitrary detention and torture.

5          17.     Ricardo Martin Hoffmann is a citizen and permanent resident of Argentina.

6   Ricardo Martin Hoffman was forced to go into exile in Italy in 1977 after his house was

7   ransacked by security forces and he discovered that these same forces were intent upon

8   arresting him at the Gonzalez-Caton plant just as they had apprehended fellow independent

9   unionist Alfredo Martin.  Ricardo Martin Hoffman brings this case on behalf of himself for the

10  damages he suffered as a result of his forced exile.

11         18.     Eduardo Estivill is a citizen and permanent resident of Argentina.   Eduardo

12  Estivill was forced to go into exile in Europe in 1977 after his house was searched by police

13  forces who were directed to his home by MBA and who were intent upon apprehending Mr.

14  Estivill.  Eduardo Estivill brings this case on behalf of himself for the damages he suffered as a

15  result of his forced exile.

16         19.     Jose Barreiro is a citizen and permanent resident of Argentina.   Jose Barreiro

17  went into hiding and internal exile in 1977 after his house was raided at night by police intent

18  upon apprehending him.  Jose Barreiro brings this case on behalf of himself for the damages he

19  suffered as a result of his forced exile.

20         20.     Alejandro Daer is a citizen and permanent resident of Argentina.  In August of

21  1977,  Mr. Daer was forced into exile in Brazil after police searched his home, detained

22  members of his family and attempted to kidnap him.  Alejandro Daer brings this case on behalf

23  of himself for the damages he suffered as a result of his forced exile.

24         21.     Eduardo Olasiregui is a citizen and permanent resident of Argentina.   Mr.

25  Olasiregui was wrongfully arrested and imprisoned for two and a half years as a result of the

26  false and malicious accusations of MBA.   He was later pardoned.   Mr. Olasiregui brings this

27  case on behalf of himself for the damages he suffered as a result of his wrongful and arbitrary

28  imprisonment.

<u>Defendant</u>

22.     Defendant DCAG is a foreign corporation with headquarters located in Stuttgart, Germany.  DCAG does significant business in the United States, in the State of California, and in this District, including the importation, manufacture, marketing and sale of automobiles, as well as research for its world-wide operations, including fuel cell research.   DCAG maintains one of its chief, North American offices, known as the DaimlerChrysler Research and Technology Center North America, within the jurisdiction and venue of this Court, located at 1510 Page Mill Road, Palo Alto, California 94306.   DCAG also operates its world-wide e-business operations from offices in Palo Alto.  DCAG, the successor-in-interest of DaimlerBenz, is the parent company of DCA (the successor-in-interest of MBA) and owns 100 percent of the latter.  DCA is either a division of DCAG, or DCA is a wholly-owned subsidiary that DCAG utilizes as its mere instrumentality and so dominates and controls that DCA is its alter ego, based either on the complete lack of separateness between the two companies, or on the fact that DCA tightly controls the operations of all of its subsidiaries and is legally responsible for all of the companies within the DCAG "enterprise."  Among other things, DCAG maintains domination and control over the employment practices, labor relations and human rights practices of DCA.   In addition, due to DCAG's specific control over the operations of DCA, DCA is the agent of DCAG.   Based on all of these relationships between DCAG and DCA, DCAG is liable for its direct role in directing or aiding and abetting the acts of DCA that resulted in harm to the Plaintiffs.  Alternatively, DCAG is vicariously liable for the acts of DCA.

23.     DCAG, in response to concerns raised by its own shareholders, recently investigated MBA (now known as DCA) in relation to the very allegations at the heart of the instant action and produced a detailed report of this investigation which it released publicly in December of 2003.  DCAG  paid the full cost of this investigation and treated the investigation as if it was an internal review of its own operations.  DCAG has publicly defended the former officials of MBA alleged to have engaged in the misconduct detailed herein and has publicly treated these officials as its own officials, referring to them as "our top management" which

FIRST AMENDED COMPLAINT

DCAG must protect.  And, while the report of this investigation concluded that these MBA officials had foreseeably placed the workers at issue in this case in mortal danger by giving their identities and addresses to repressive state forces in Argentina, and by designating these workers as "subversives" to these forces, DCAG nonetheless continues to defend the conduct of these officials and of MBA.  DCAG has thereby ratified this conduct, and is liable for the conduct either because it was done by its own employees or its agents.

24.     In addition, throughout the time period at issue in this case, MBA was dominated and controlled by DaimlerBenz, the predecessor-in-interest of Defendant DCAG, through such DaimlerBenz officers as Klaus Oertel.  The domination and control of MBA resulted in MBA acting as a legal or *de facto* agent for DaimlerBenz with respect to the wrongful acts alleged herein.  DaimlerBenz was fully aware of the participation of the MBA officials in the human rights violations detailed in this Complaint and DaimlerBenz approved and ratified this participation at the time it took place.  As a result of the above, Defendant DCAG is either directly liable for its own conduct in aiding and abetting the actions of MBA or is vicariously liable for the conduct of its agent MBA.  Plaintiffs also name as Defendants Does 1-50 in the event that there are other entities not yet known, either divisions or subsidiaries of DCAG, that played a role in the wrongful acts alleged herein.

III.    <u>JURISDICTION</u>

25.     This Court has federal question jurisdiction under 28 U.S.C. §1331 and The Alien Tort Claims Act, 28 U.S.C. § 1350.  The Alien Tort Claims Act  ("ACTA") provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  Plaintiffs' causes of action arise under, <u>inter</u> <u>alia</u>, customary international law, as expressed in the Universal Declaration of Human Rights; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; the International Covenant on Civil and Political Rights; the Charter of the Organization of American States; the American Declaration of the Rights and Duties of Man; and the American Convention on Human Rights.

26.     This Court also had federal question jurisdiction under the Torture Victims

Protection Act, 28 U.S.C., §1350, note.  The Torture Victims Protection Act ("TVPA")

expressly provides for civil liability against any "individual," interpreted by the Ninth Circuit

to include corporation, "who, under actual or apparent authority, or color of law, of any foreign

nation -- (1) subjects an individual to torture   . . . or (2) subjects an individual to extra-judicial

killing . . . ."

27.     This Court has supplemental and ancillary jurisdiction over the state law claims.

28.     This Court also has diversity jurisdiction over the federal and state claims

pursuant to 28 U.S.C. Section 1332, because the matter in controversy exceeds $75,000

exclusive of interest and costs for each named Plaintiff, and there is  complete diversity

between all Plaintiffs and the Defendant.

## IV.   INTRADISTRICT ASSIGNMENT

29.     Venue properly lies in this Court pursuant to 28 U.S.C. §1391 (b) and (c)

because DCAG does business and maintains a primary place of business within the State of

California and within the district of this Court.  In particular, DCAG maintains a facility

known as DaimlerChrysler Research and Technology Center North America at 1510 Page Mill

Road, Palo Alto, California 94306, and it operates its world-wide e-business operations

through offices in Palo Alto.

## V.   FACTS

30.     In 1975, amidst labor strife between MBA and its workers, and amidst labor

strife in general in Argentina, MBA signed an accord in which it agreed to set aside one

percent of its sales for the "eradication of the negative elements of the factory."  This accord

was officially approved by the national Labor Ministry of Argentina.

31.     Shortly after Mercedes signed the above-referenced accord, a majority of

workers at the MBA plant in Gonzalez-Catan elected an independent commission to represent

them in discussing wages and other terms and conditions of employment with MBA.  This

commission came to be known as "the group of nine" or the "Internal Commission."  MBA

refused to negotiate with this Internal Commission.  In response, approximately 4,000 workers

went out on strike in support of the demand that MBA recognize and bargain with the Internal

FIRST AMENDED COMPLAINT

1   Commission.   MBA discharged 117 of these striking workers whom Klaus Oertel, then an

2   officer of DaimlerBenz and chief Director of MBA, characterized as "known activists, [and]

3   extreme elements."   The firing of these workers was ratified by the Labor Ministry of

4   Argentina which declared the strike illegal.

5        32.   Subsequently, a high-ranking official of MBA, Heinrich Metz, was kidnapped.

6   Mr. Metz was ultimately released unharmed.  In response to this kidnapping, MBA Director of

7   Legal Affairs Ruben Cueva sent a declaration to the political police of Argentina in which he

8   singled out four ex-workers of MBA, including Plaintiff Eduardo Olasiregui, as the potential

9   perpetrators of this kidnapping.  As Cueva explained in this October 24, 1975 letter, all of

10   these four suspects had been workers and activists at MBA, but had been discharged no later

11   than October of 1974.  Cueva in this same letter insinuated that the kidnapping was linked to

12   the strike in the MBA plant in 1975 in which workers demanded that MBA recognize and

13   bargain with the Internal Commission.   Cueva then went out of his way in this same letter to

14   name all of the members of this Commission, including Plaintiffs Eduardo Estivill and Jose

15   Barreiro and to provide the political police with their home addresses.

16        33.   In 1976, shortly after the aforementioned events, the military overthrew the

17   democratically-elected President of Argentina, Isabel Peron, and set up a military junta which

18   governed over Argentina until 1983.   During the period of this military rule, approximately

19   30,000 individuals were kidnapped, tortured and "disappeared" by the military and police

20   forces.  A disproportionate number of these "disappeared" were blue collar workers with trade

21   union affiliations.

22        34.   The height of the military repression, including the "disappearances," occurred

23   in the first year following the coup, from 1976 through 1977.  As indicated in a March 22,

24   1977 memorandum of MBA, MBA approved of the methods of the military and police during

25   this period, stating that "[i]n those days you achieved important results in the military reaction

26   against the guerilla, among other things, one of those responsible for the kidnapping of Metz

27   was eliminated.  In general the result of the government's methods during its first year were

28   favorable and open good prospects for the development of the country."

35.     During this period of intense repression from 1976 through 1977, MBA, fully aware of the conduct of the military and police in "disappearing" individuals they perceived as "subversive" or  "extremist," maintained close ties with high-ranking members of the military and police forces and utilized these forces to rid its plant in Gonzalez-Catan of individuals MBA itself viewed as "subversive" and as slowing production, including leaders and supporters of the independent commission.  To this end, MBA, through various high-ranking employees/officials -- including Director of Human Resources Pedro de Elias, Director of Legal Affairs Ruben Pablo Cueva, and Director of Production Juan Tasselkraut -- had members of the military and police forces stationed within the Gonzalez-Catan plant, opened the plant to periodic raids by these forces and identified to these forces which workers it deemed to be "subversive."  These MBA officials did so with the full knowledge that the singling out of alleged "subversives" to these military and police forces would foreseeably result in the summary apprehension, detention, torture and "disappearance" of such individuals.

36.     As a recently declassified U.S. State Department document noted, as a general matter, management of corporations in Argentina collaborated with the state security forces in this repression in order to rid the corporations of labor agitators.  As this document, a wire from the U.S. Embassy in Buenos Aires to the U.S. Secretary of State written in June of 1978, explained: "WE BELIEVE THERE IS A GREAT DEAL OF COOPERATION GENERALY BETWEEN MANAGEMENT REPRESENTATIVES AND THE SECURITY AGENCIES AIMED AT ELIMINATING TERRORIST INFILTRATORS FROM THE INDUSTRIAL WORK PLACES AND AT MINIMIZING THE RISK OF INDUSTRIAL STRIFE."  This same document noted the disturbing trend, particularly in the first years of the military coup, of "DENUNCIATIONS FROM MANAGEMENT OF ALLEGED TERRORIST ACTIVITIES IN THE PLANTS WHICH MAY BE LITTLE MORE THAN LIEGITIMATE [sic.](ALBEIT ILLEGAL) LABOR UNREST."  MBA's collaboration with the security forces in dealing with its labor unrest was typical of the period.

37.     This collaboration between Argentine authorities and corporations generally,

FIRST AMENDED COMPLAINT

and MBA in particular, emanated from their shared aim of ridding industry of labor union activity. This aim is set forth in the following statement by the Minister of Labor on November 12, 1977: ". . . the Government and the Armed Forces have committed their resources and maximum effort to guaranteeing the freedom to work, and family and individual security for management and workers, and the annihilation of that public enemy. But it is worth remembering that those who deviate from the course taken by the 'Process' in search of individual or group benefit become accomplices of that subversion which must be destroyed, as do those who lack the courage to assume the responsibilities imposed by this situation."

38. The individuals MBA singled out to the authorities as "subversives" included all of the Plaintiffs in this case: Oscar Alberto Alvarez Bauman, Miguel Grieco, Diego Nuñez, Esteban Reimer, Alberto Francisco Arenas, Alberto Gigena, Fernando Omar del Connte, Hector Belmonte, Jorge Leichner, Hector Ratto, Eduardo Olasiregui, Ricardo Martin Hoffman, Eduardo Estivill, Alfredo Manuel Martin, Juan Jose Martin, Jose Barreiro and Alejandro Daer. All of these individuals were activists in the Internal Commission.

39. The first Plaintiff to fall victim to MBA's campaign against independent activists was Juan Jose Martin. On April 29, 1976, Plaintiff Juan Jose Martin was kidnapped by military and police forces directly from his post at work at the MBA plant in Gonzalez-Catan. The forces engaged in this kidnapping were directed by MBA officials, including Director of Human Resources Pedro de Elias and Director of Production Juan Tasselkraut, to Juan Jose Martin and were told by these same MBA officials that he was a "subversive." Juan Jose Martin was held in the custody of the military in the police station of San Justo without warrant or charges for 19 days, during which time he was physically and mentally tortured by the military. This torture included electroshocks to Mr. Martin's person. Ruben Lavallen, the Chief of this police station at the time, oversaw the torture and interrogation of Mr. Martin and did so with the knowledge and approval of Director of Human Resources Pedro de Elias.

40. On May 5, 1976, during this period of captivity, Pedro de Elias wrote a memorandum in which he stated that Juan Jose Martin was being detained by military authorities. As Pedro de Elias wrote in referring to Martin, "the military authorities detained a

11

worker inside the plant in the search of his home prohibited Marxist books were found." Juan Jose Martin was finally released alive after his 19 days of captivity as a result of the protest of fellow workers and union activists.

41. On December 14, 1976, Plaintiff Alfredo Martin, a union leader, was kidnapped from his home by police forces, including station Chief Ruben Lavallen, and brought to the police headquarters in San Justo where he was held for hours without warrant or charges. During his period of captivity, Alfredo Martin was physically and mentally tortured by both military forces and Ruben Lavallen who, *inter alia*, submitted his body to electroshocks. Again, the kidnapping and torture of Martin were carried out by the police forces with the knowledge and approval of MBA officials, including Pedro de Elias. When Martin returned to the MBA plant in Gonzalez-Catan after being held and tortured, Director of Production Juan Tasselkraut was waiting for him and acknowledged that he knew exactly what had happened with Martin.

42. Also on the night of December 14, 1976, union activist Miguel Grieco, a worker at the MBA plant in Gonzalez-Catan was forcibly kidnapped from his home by police forces at the direction of MBA officials, including Director of Human Resources Pedro de Elias. Miguel Grieco was never seen or heard from again after this night. Mr. Grieco is presumed murdered and is officially listed as one of Argentina's "disappeared."

43. On January 5, 1977, Esteban A. Reimer, an active leader of the Internal Commission and one of the chief spokesmen for the workers at the MBA plant in Gonzalez-Caton, was seized at his home by members of the First Army Command in front of his family and taken away. These military forces carried with them a list upon which Reimer's name appeared. Before withdrawing from Reimer's home with Mr. Reimer in their custody, they crossed Mr. Reimer's name from this list. Reimer's family members searched for him at local police stations but no officials at these stations would acknowledge that Mr. Reimer had been apprehended. After his disappearance, he was seen only once again. Specifically, he was seen with fellow union leader and MBA employee Victor Hugo Ventura, who was also kidnapped on the night of January 5, 1977, at the police station of Ruben Lavallen. After that, neither

FIRST AMENDED COMPLAINT

1    Reimer nor Ventura were ever seen again.   Both Reimer and Ventura are presumed murdered

2    and are officially listed among Argentina's "disappeared."

3         44.    The security forces who captured Mr. Reimer on the night of January 5, 1977

4    were acting upon intelligence given to them by MBA officials.  Specifically, they were acting

5    upon copies of personnel files which MBA gave to the military forces at the end of 1976 in

6    which MBA accused him of distributing pamphlets endorsed by the Internal Commission and

7    referring to him as an "agitator" who would "integrate the Workers Movement of the

8    Company."  According to DCAG's own internal report of the events at issue in this lawsuit, a

9    report just released in December of 2003, MBA's release of this information to the state

10   security forces had foreseeably "fatal consequences" for Mr. Reimer.

11        45.    Shortly thereafter, military forces came searching for and ransacked the homes

12   of MBA workers and union activists Ricardo Martin Hoffman, Eduardo Estivill and Jose

13   Barreiro.  The military forces came looking for these individuals with the intent to kidnap and

14   "disappear" them, as they had the others, based upon MBA's assertion to these forces that they

15   were "subversives."  In response to these activities of the military and in light of their

16   knowledge of the kidnapping and disappearance of their co-workers as described above,

17   Plaintiffs Hoffman, Estivill and Barreiro were forced into hiding and exile in fear for their very

18   lives.  Specifically, Hoffman and Estivill were forced to go into exile in Europe.

19        46.    In August of 1977, tensions between MBA and the supporters of the Internal

20   Commission became increasingly tense over a work slowdown initiated by the independent

21   union activists.   In early August of 1977, MBA Director of Human Resources Pedro de Elias

22   wrote in a memorandum that "the factory finds itself in a critical situation . . . with serious

23   consequences for the production."  Shortly after this was written, union activists were

24   systematically kidnapped and disappeared by police and military forces acting at the behest of

25   MBA officials, including MBA Director of Production Juan Tasselkraut and MBA Director of

26   Human Resources Pedro de Elias.

27        47.    Specifically, between August 12 and August 19, 1977, MBA workers and

28   independent union activists Oscar Alberto Alvarez Bauman (Aug. 4), Hector Ratto (Aug. 12),

13

1   Fernando Omar Del Connte (Aug. 12), Alberto Gigena (Aug. 13), Hector Belmonte (Aug. 13),

2   Diego Nuñez (Aug. 13), Jorge Alberto Leichner (Aug. 14) and Alberto Francisco Arenas (Aug.

3   19) were forcibly apprehended and kidnapped by military forces.  Of these individuals, only

4   Hector Ratto survived.  All of these other individuals were never seen or heard from again.

5   They are presumed murdered and are officially listed as Argentina's "disappeared."  In the

6   case of disappeared Alberto Gigena, his wife Plaintiff Graciela Beatriz Velazquez de Gigena

7   witnessed his violent kidnapping from their home on the night of August 13.  This kidnapping

8   was carried out, as she witnessed, by police forces including station Chief Ruben Lavallen.

9       48.     As for Hector Ratto, he was kidnapped directly from the MBA plant in

10  Gonzalez-Catan by military forces acting at the direction of MBA Director of Production Juan

11  Tasselkraut.  Hector Ratto was held in a secret detention center for one and a half years, during

12  which time he was regularly tortured by the police and military forces through, *inter alia*, the

13  electroshocking of his person.  This electroshock torture resulted in Mr. Ratto's arms being

14  paralyzed for over 2 months.

15      49.     Other MBA workers and independent union activists, not represented in this

16  lawsuit, were also "disappeared" during this period in August of 1977, including Juan Jose

17  Mosquera and Charles del Carmen Grossi.

18      50.     In addition, during this same period in August of 1977, military forces came

19  searching for and ransacked the homes of MBA worker and union activist Alejandro Daer.

20  The military forces detained some family members of Alejandro Daer in an attempt to coerce

21  them into telling them of Daer's whereabouts.  The military forces came looking for Daer with

22  the intent to kidnap and "disappear" him as they had the others based upon MBA's assertion to

23  these forces that Daer was a "subversive."  In response to these activities of the military and in

24  light of their knowledge of the kidnapping and disappearance of their co-workers as described

25  above, Plaintiff Alejandro Daer was forced into hiding and exile in fear for his life.

26  Specifically, Daer was forced into exile in Brazil.

27      51.     After this period in August of 1977 in which the aforesaid workers were

28  detained, "disappeared" or forced into exile, MBA Director of Human Resources Pedro de

---

14

1    Elias wrote in an MBA memorandum that the actions of the military in ridding MBA of these

2    workers had, as anticipated, ended the production slowdown and were welcome by MBA.  As

3    he wrote, "the workers of MBA detained by the security forces were still not freed.  In the

4    factory they calmed the situation but they have not normalized it.  The strike ended on Friday

5    and without it the production has returned to its maximum performance."

6        52.    MBA, with full knowledge and approval of police station Chief Ruben

7    Lavallen's participation in the crimes as described above, hired Mr. Lavallen as Chief of

8    Security for MBA in 1978.   In addition, MBA and DCAG provided legal representation to

9    Ruben Lavallen in criminal proceedings related to Mr. Lavallen's human rights abuses.  In so

10   hiring Lavallen and providing legal defense to him, MBA and DCAG formalized the agency

11   relationship which it maintained with Lavallen throughout the period described above when

12   the independent union activists were kidnapped, tortured and disappeared and ratified

13   Lavallen's conduct in participating in these crimes.

14       53.    Plaintiff Eduardo Olasiregui, who had been accused by MBA Director of Legal

15   Affairs Ruben Cueva as one of the suspected kidnappers of MBA official Metz, was arrested

16   by official police forces and imprisoned for two and a half years as a result of this charge.  This

17   charge had been maliciously leveled by Cueva as retaliation for Olasiregui's union activities.

18   Olasiregui was later exonerated and pardoned for the kidnapping of Metz, but not before he

19   lost years of his life to imprisonment.

20       54.    Defendant DCAG and its alter ego and/or agent, MBA (now known as "DCA")

21   are vicariously liable for all of the aforementioned tortious actions as they were committed in

22   furtherance of MBA's business interests and activities and with the advance knowledge,

23   acquiescence and subsequent ratification of MBA and DaimlerBenz, the predecessor-in-

24   interest of DCAG.  Defendant DCAG itself has recently ratified these tortious acts through its

25   actions as detailed above in paragraph 23.  Further, all of the wrongful acts alleged herein were

26   committed by individuals retained as employees or agents of MBA, making DCAG, through

27   the agents of its alter ego or agent, MBA, directly or vicariously liable for all of the wrongful

28   acts.

55.     Plaintiffs do not have an adequate forum in Argentina in which to bring the instant action.  This is so because, despite very recent changes in the central government of Argentina, the Argentine courts are still filled with corrupt judges from the period of the repression.  Moreover, the judiciary of Argentina is not independent, but rather, is greatly susceptible to political influence, particularly by large multinational interests such as Defendant DCAG.   In addition, Plaintiffs have a legitimate fear of reprisal if they bring this action in Argentina because the police and military forces are also filled with officials left over from the repression and because people continue to be threatened for speaking out against the injustices which occurred during the time of the military dictatorship.  Indeed, Alfredo Martin was recently the subject of a kidnap attempt, and he was threatened that if he continued to speak out about his treatment during the military dictatorship, he would be kidnapped.  Civil cases in Argentina routinely take over 10 years to reach decision, and the remedy provided in analogous civil cases is inadequate.  Plaintiffs in civil cases in Argentina do not have a right to a jury, nor are punitive damages available.

56.     While the events at issue in this case took place some time ago, the statute of limitations in this case should be tolled because MBA, and the police and military forces it conspired with, actively attempted (many times successfully) to hide their crimes by "disappearing" the bodies of the victims.  The bodies of all the "disappeared" at issue in this case have never been found.  The destruction of evidence by the "disappearance" of the individuals in this case have also severely hampered and delayed the attempts of the surviving Plaintiffs in this case to ascertain the facts surrounding their victimization and to ascertain the identity of those responsible for their victimization.  In addition, after the military dictatorship, the government of Argentina passed immunity laws which protected those guilty of the crimes committed during the dictatorship and thereby assured that the facts surrounding these crimes would not come to light.  These immunity laws remain on the books to this day.   As a result, the facts of this case have only recently emerged in the past few years.

///

///

FIRST AMENDED COMPLAINT

## VI.   DEFENDANT'S VIOLATIONS OF LAW

57.   Defendant's actions as hereinabove alleged violate, and Plaintiffs' causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

a.   Alien Tort Claims Act, 28 U.S.C. § 1350;

b.   Torture Victims Protection Act, 28 U.S.C. § 1350;

c.   Common law of the United States of America;

d.   United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

e.   Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

f.   International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

g.   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

h.   Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

i.   Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

j.   Article 3 of the Geneva Conventions; and

k.   Statutes and common law of the State of California, including but not limited to, wrongful death, negligence, and recklessness.

///

///

///

17

VII.  CLAIMS FOR RELIEF

First Cause of Action
(For Extrajudicial Killing
On Behalf of Category I Plaintiffs Against Defendant)

58.     Plaintiffs incorporate by reference paragraphs 1 through 57 of this Complaint as is set forth herein.

59.     Defendant, or Defendant's employees or agents, engaged in acts of intentionally and tortiously causing the apprehension, torture, deaths and disappearances of worker activists Oscar Alberto Alvarez Bauman, Miguel Grieco, Diego Nuñez, Esteban A. Reimer, Alberto Francisco Arenas, Alberto Gigena, Fernando Omar Del Connte, Jorge Leichner and Hector Belmonte.  Specifically, as is alleged above, Defendant, operating under color of law, conspired and acted jointly with the Argentina military and police to have these workers kidnapped, tortured and murdered.  Defendant's employees and/or agents, including high-ranking officials Pedro de Elias and Juan Tasselkraut, acting in the furtherance of Defendant's business interests, carried forth this conspiracy to disappear these workers.   In addition, Defendant aided and abetted the Argentina military and police by providing significant moral and logistical support, supplies, intelligence and other substantial assistance that contributed to the ability of the Argentine police and military to carry out the murder and disappearances of Oscar Alberto Alvarez Bauman, Miguel Grieco, Diego Nuñez, Esteban A. Reimer, Alberto Francisco Arenas, Alberto Gigena, Fernando Omar Del Connte, Hector Belmonte and Jorge Leichner.  Defendant furthermore ratified the participation of police station chief Ruben Lavallen in a number of these crimes when, with full knowledge of this participation, it hired him as its Chief of Security after the crimes were committed.  These acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 57, *supra*.  The acts described herein are actionable under the ATCA and the TVPA, and, if such a showing is required, were done jointly with the official armed forces of Argentina.

60.     Defendant's conduct in violation of the law of nations, customary international

18

law, and worldwide industry standards and practices, including, but not limited to, the specific

laws, agreements, conventions, resolutions and treaties listed in paragraph 57, <u>supra</u>, resulted

in the deaths of Plaintiffs' family members.  Defendant is directly liable for these violations of

the law of nations, customary international law, and worldwide industry standards and

practices, including, but not limited to, the specific laws, agreements, conventions, resolutions

and treaties listed in paragraph 57, <u>supra</u>.  Defendant is also vicariously liable for any

violations of its employees or agents of the law of nations, customary international law, and

worldwide industry standards and practices, including, but not limited to, the specific laws,

agreements, conventions, resolutions and treaties listed in paragraph 57, <u>supra</u>.

61.   Plaintiffs seek compensatory and punitive damages, in amounts to be ascertained

at trial, for the losses and suffering they endured as a result of the murder of their loved ones

named herein.  Plaintiffs' losses and suffering are particularly acute in light of the fact that

their loved ones were "disappeared" and their bodies never found, preventing them from ever

obtaining closure over their deaths.  Indeed, the lives of the Plaintiffs have been invariably

shattered as a result of these disappearances.  Plaintiffs, as the heirs of these disappeared

workers, also seek compensatory and punitive damages, amounts to be ascertained at trial, for

the losses and suffering endured by these individuals as a result of the wrongful actions of the

Defendant herein.

Wherefore, Plaintiffs pray for relief as set forth below.

<u>Second Cause of Action</u>
(For Torture
On Behalf of Category II Plaintiffs Against Defendant)

62.      Plaintiffs incorporate by reference paragraphs 1 through 61 of this Complaint as

if set forth herein.

63.      The acts described herein placed Plaintiffs in great fear for their lives and caused

them to suffer severe physical and mental pain and suffering.  Defendant is responsible for

these acts based on the relationships alleged herein, particularly with reference to paragraphs

60-61 above. Plaintiffs have been subjected to acute and continuing emotional and physical

trauma as a result of their being kidnapped, arbitrarily imprisoned, electroshocked and/or

forced into exile.   This continuing emotional and physical trauma of the Plaintiffs includes severe depression, headaches, nightmares, lack of concentration and suicidal urges.  The severe suffering of Plaintiffs was a foreseeable and intended consequence of Defendant's actions described herein.  Defendant acted with knowing disregard for the life and well-being of the Plaintiffs.  The acts of Defendant amounted to the torture of Plaintiffs and violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 57, supra.

64.   The acts described herein were inflicted deliberately and intentionally for purposes which include, among others, punishing the victim or third persons, and constitute torture in violation of the laws of nations as described above in paragraph 57, supra, and are therefore actionable under both the ATCA and the TVPA.

Wherefore, Plaintiffs pray for relief as set forth below.

Third Cause of Action
(For Crimes Against Humanity
On Behalf of All Plaintiffs Against Defendant)

65.   Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint as if set forth herein.

66.   The apprehension, kidnapping, detention, torture and disappearance of the individuals named in this action were neither random nor occasional but widespread and systematic.  These acts occurred under the direction, encouragement and acquiescence of Defendant and in furtherance of Defendant's business.  Defendant is responsible for these acts based on the relationships alleged herein, particularly with reference to paragraphs 60-61 above. As a result of these acts, all of the Plaintiffs have been subjected to acute and continuing emotional and physical trauma, including severe depression, headaches, nightmares, lack of concentration and suicidal urges.

67.   The acts described herein constitute crimes against humanity, in violation of the laws described in paragraph 57 above, and are therefore actionable under the ATCA. Customary international law prohibits inhumane acts of a very serious nature such as

20

kidnapping, willful killing, torture, arbitrary detention, forced exile and other inhumane acts committed as part of a widespread or systematic attack against any civilian population. Leaders, organizers, instigators and accomplices participating in the formulation of these acts, such as Defendant here, are responsible for all acts performed by any person in execution of such plan.

Wherefore, plaintiffs pray for relief as set forth below.

Fourth Cause of Action
(For Cruel, Inhuman and Degrading Treatment
On Behalf of All Plaintiffs Against  Defendant)

68.     Plaintiffs incorporate by reference paragraphs 1 through 67 of this Complaint as if set forth herein.

69.     The acts described herein had the intent and the effect of grossly humiliating and debasing Plaintiffs, inciting fear and anguish and breaking their will and physical and moral resistance.  As a result of these acts, all of the Plaintiffs have been subjected to acute and continuing emotional and physical trauma, including severe depression, headaches, nightmares, lack of concentration and suicidal urges. Defendant is responsible for these acts based on the relationships alleged herein, particularly with reference to paragraphs 60-61 above.

70.     Plaintiffs were placed in great fear for their lives and the lives of their loved ones and were forced to suffer severe physical and psychological abuse and agony.

71.     The acts described herein constitute cruel, inhuman and degrading treatment in violation of the laws described in paragraph 57 and are therefore actionable under the ATCA.

Wherefore, Plaintiffs pray for relief as set forth below.

Fifth Cause of Action
(For Wrongful Death
On Behalf of Category I Plaintiffs Against Defendant)

72.     Plaintiffs incorporate by reference paragraphs 1 through 71 of this Complaint as if set forth herein.

73.     Defendant, or Defendant's employees or agents, acted in concert with Argentine

21

1   military and police to commit acts that constitute wrongful death under the laws of the State of

2   California and that caused the deaths of Oscar Alberto Alvarez Bauman, Miguel Grieco, Diego

3   Nuñez, Esteban A. Reimer, Alberto Francisco Arenas, Alberto Gigena, Fernando Omar Del

4   Connte, Hector Belmonte and Jorge Leichner.  Plaintiffs, relatives and representatives of the

5   estates of these deceased, seek damages herein for pecuniary loss resulting from loss of

6   society, comfort, attention, services and support and for the losses suffered by these murdered

7   and "disappeared" individuals.

8           74.    Defendant's actions were a direct and substantial cause of the deaths of Oscar

9   Alberto Alvarez Bauman, Miguel Grieco, Diego Nuñez, Esteban A. Reimer, Alberto Francisco

10  Arenas, Alberto Gigena, Fernando Omar Del Connte, Hector Belmonte and Jorge Leichner.

11  Defendant failed to use due care to protect them from injury and harm, thereby proximately

12  causing their wrongful deaths.  Plaintiffs are entitled to recover compensatory and punitive

13  damages in amounts to be ascertained at trial.

14          Wherefore, Plaintiffs pray for relief as set forth below.

15                              Sixth Cause of Action
                    (For Intentional Infliction of Emotional Distress
16                       By All Plaintiffs Against Defendant)

17          75.    Plaintiffs incorporate by reference paragraphs 1 through 74 of this Complaint as

18  if set forth herein.

19          76.    The conduct alleged herein on the part of Defendant constitutes extreme and

20  outrageous conduct against the Plaintiffs.

21          77.    Defendant intended to cause Plaintiffs to suffer severe emotional distress, or, in

22  the alternative, Defendant engaged in the conduct with reckless disregard of the probability of

23  causing these individuals to suffer severe and ongoing emotional distress.

24          78.    Plaintiffs suffered and continue to suffer severe emotional distress and the

25  outrageous conduct of Defendant was a cause of the emotional distress suffered by them.

26          79.    Defendant's outrageous conduct constitutes the intentional infliction of

27  emotional distress and is actionable under the laws of California, the United States and

28  Argentina.

FIRST AMENDED COMPLAINT

Wherefore, Plaintiffs pray for relief as set forth below.

VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

1.    enter judgment in favor of Plaintiffs on all counts of the Complaint;

2.    declare that Defendant has violated Plaintiffs' human rights and the laws of the State of California and the United States, as set forth herein;

3.    award Plaintiffs compensatory and punitive damages in an amount to be proven at trial;

4.    award Plaintiffs the costs of suit including reasonable attorneys' fees;

5.    award Plaintiffs such other and further relief as the Court deems just under the circumstances.

Dated:  February 10, 2004          Respectfully submitted,

                                   CHAVEZ & GERTLER LLP

                                   INTERNATIONAL  LABOR RIGHTS FUND

                                   DANIEL M. KOVALIK

                                   By:    /s/
                                          KIM E. CARD

                                   Attorneys for Plaintiffs BARBARA BAUMAN, et al.


                            DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  February 10, 2004          Respectfully submitted,

                                   CHAVEZ & GERTLER LLP

                                   INTERNATINOAL LABOR RIGHTS FUND

                                   DANIEL M. KOVALIK

                                   By:    /s/
                                          KIM E. CARD

                                   Attorneys for Plaintiffs BARBARA BAUMAN, et al.

23

1

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2

3        Pursuant to Civil Local Rule 3-16, the undersigned certifies that as of this date, other

than the named Plaintiffs, there is no such interest to report.

4

5

Dated:  February 10, 2004                Respectfully submitted,

6

CHAVEZ & GERTLER LLP

7

INTERNATIONAL LABOR RIGHTS FUND

8

DANIEL M. KOVALIK

9

10

By:   __/s/_____

11                                          KIM E. CARD

12                                      Attorneys for Plaintiffs BARBARA BAUMAN, et al.

13

14   FIRST AMENDED COMPLAINT

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24