1

2

3

4                                                    **E-FILED on** ___11/22/05___

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   BARBARA BAUMAN, et al.,                No. C-04-00194 RMW

13            Plaintiffs,                   ORDER TENTATIVELY GRANTING
                                            DEFENDANT'S MOTION TO DISMISS
14       v.
                                            **[Re Docket No. 36]**
15   DAIMLERCHRYSLER AG, and DOES 1
     thorough 50, inclusive,
16
              Defendants.
17

18          Specially-appearing defendant DaimlerChrysler AG ("DCAG") filed a motion to quash service and

19   dismiss for lack of personal jurisdiction.  Plaintiffs oppose the motion.  The motion to dismiss was heard on

20   June 17, 2005.  The motion to quash was withdrawn.  The court has reviewed the parties' papers filed

21   before the hearing and considered their arguments.  The court has also reviewed plaintiffs' post-hearing

22   notice of filing of supplemental authority but sustains defendant's objection to its consideration.  For the

23   reasons set forth below, the court tentatively grants  DCAG's motion to dismiss for lack of personal

24   jurisdiction but allows plaintiffs some limited jurisdictional discovery.

25                              **I.  BACKGROUND**

26          Plaintiffs are twenty-three people, one of whom is a citizen of Chile and the rest of whom are

27   citizens of Argentina.  Amend. Compl. ¶¶ 3-21.  Plaintiffs allege that Mercedes-Benz Argentina

28   ("MBA")—now known as DaimlerChrysler Argentina ("DCA")—collaborated with the Argentine

1  government to kidnap, detain, torture, or kill plaintiffs or plaintiffs' relatives during Argentina's military

2  regime of 1976 to 1983, known as the "Dirty War."  *Id.* ¶¶ 1-21.  Claiming that DCA is either a division or

3  wholly-owned subsidiary of DCAG, plaintiffs bring this action against DCAG under the Alien Tort Claims

4  Act ("ATCA"), 28 U.S.C. § 1350, and the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350.

5  *Id*.

6          In 1998, Chrysler Corporation and Daimler-Benz AG became wholly-owned subsidiaries of

7  DCAG.  Louann Van Der Wiele Decl. Supp. DCAG's Mot. ("Wiele Decl.") ¶ 2.  Consequently, Chrysler

8  Corporation, which had its principal place of business in Auburn Hills, Michigan, changed its name to

9  DaimlerChrysler Corporation ("DCC").  *Id.*  DCC maintains the same headquarters as Chrysler

10  Corporation had maintained before.  *Id.*; Miller Decl., Ex. 1.

11          DCAG contends that it is a German stock company with headquarters located in Stuttgart,

12  Germany.  *Id.*; Amend. Compl. ¶ 22.  DCAG is not qualified or authorized to do business in California and

13  does not import, manufacture, sell, service, or warranty cars in California.  It manufactures Mercedes-Benz

14  vehicles in Germany.  Peter Waskonig Decl. Supp. DCAG's Mot. ("Waskonig Decl.") ¶ 3.  A separate

15  Delaware corporation, Mercedes-Benz United States, LLC ("MBUSA") purchases Mercedes-Benz cars

16  in Germany, imports them into the United States, and distributes them throughout the United States.  *Id.* ¶¶

17  7, 10.  MBUSA also provides all product advertisement, service and sales support for Mercedes-Benz

18  vehicles in the United States.  *Id.* ¶ 7.  Plaintiffs, however, allege that DCAG is both an American and

19  German corporation with headquarters in both countries, respectively, in the cities of Auburn Hills and

20  Stuttgart.  Brian Campbell Decl. Opp. DCAG's Mot. ("Campbell Decl."), Ex. 1, 2.

21          Plaintiffs originally named DCC as the defendant.  Compl. ¶ 1.  They subsequently amended their

22  complaint, replacing DCC with DCAG as the defendant.  Amend. Compl. ¶ 1.  Plaintiffs originally believed

23  that DCAG had its sole headquarters in Stuttgart, Germany.  Compl. ¶ 22.  In accord with the procedures

24  set forth by the Hague Convention for international service of process, plaintiffs initiated service attempts

25  upon DCAG through the German courts.  Plaintiffs' Ex Parte Appl. Ct. Iss. Amend. Summons ("Appl.

26  Amend. Summons") ¶ 1.  The German district court authorized service of process upon DCAG on July 14,

27  2004.  Req. Jud. Not. ("RJN"), Ex. A.  On September 7, 2004, however, the German appellate court

28  halted service to determine whether service would violate Germany's sovereignty rights.  If that was the

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1    case, the requested service could potentially be refused according to the Hague Convention, Article 13(1).

2    *Id.*  Whether plaintiffs' requested service in Germany will be permitted awaits resolution by Germany's

3    highest court of a matter involving Napster and Bertelsmann AG, which poses similar issues.  *Id.*  On

4    March 7, 2005, after hearing the parties' comments on the temporary suspension of service, the German

5    appellate court reaffirmed its original stay order.  RJN, Ex. B.

6         From a proxy statement to shareholders regarding the 1998 merger of Chrysler Corporation with

7    Daimler-Benz AG, plaintiffs discovered that DCAG purports to maintain operational headquarters at the

8    DCC headquarters in Auburn Hills, Michigan.  Appl. Amend. Summons at 3.   Plaintiffs then applied for

9    and were issued an amended summons for DCAG at the Auburn Hills location.

10        On January 28, 2005, plaintiffs' process server first attempted to serve DCAG at DCC

11   headquarters but was unsuccessful.  Sunny Miller Decl. Opp. DCAG's Mot. ("Miller Decl.") ¶ 3; Elizabeth

12   Tichvon Decl. Supp. DCAG's Mot. ("Tichvon Decl.") ¶¶ 2-5.  Elizabeth Tichvon, the service of process

13   paralegal for DCC, explained to the server that she and DCC were not authorized to accept service of

14   process on behalf of DCAG.  *Id.*; Wiele Decl., Letter from Van Der Wiele to Plaintiffs' Counsel of 3/2/05,

15   Ex. 1.  On February 15, 2005, plaintiffs' process server Sunny Miller attempted to serve process on

16   DCAG at the DCC headquarters but was not permitted to proceed any further than the reception area.

17   Miller Decl. ¶ 5; Tichvon Decl. ¶ 6.  Tichvon explained to Miller that DCC and not DCAG was located at

18   the premises.  Miller Decl. ¶ 3.  In addition, Tichvon reiterated her statements on January 28 to Miller and

19   told Miller that she did not work for DCAG.  Tichvon Decl. ¶ 6.   Plaintiffs contend that as Tichvon walked

20   away, Miller told her that he was leaving the papers there for DCAG.  Miller Decl. ¶ 5.  Miller then left the

21   papers at the security desk in the presence of security guard Eric Uzenski, who works for Wackenhut

22   Corporation.  *Id.*  The papers were returned to plaintiffs' counsel.  Wiele Decl. ¶ 6.

23        On March 3 and March 10, 2005, plaintiffs mailed copies of the summons and complaint to the

24   DCC headquarters by registered mail.  *Id.* ¶ 7.  Plaintiffs also mailed a copy of the summons and complaint

25   to the Michigan Corporation Securities Bureau.  Miller Decl. ¶ 4.  The documents were addressed to

26   Jurgen Schrempp, Chief Executive Officer ("CEO") of DCAG.  Wiele Decl. ¶ 6.  DCAG contends that

27   Schrempp was not present at the DCC headquarters on March 3 and 10.  *Id.* at 7; Waskonig Decl. ¶ 11.

28   In addition, DCAG contends that Schrempp has no office in Auburn Hills but has an office in Stuttgart,

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1   Germany.  Plaintiffs, however, allege that Schrempp has offices in both Auburn Hills and Stuttgart.

2   Waskonig Decl. ¶ 11; Campbell Decl., Ex. 2.   Plaintiffs further allege that the copy of the summons and

3   complaint sent on March 10, 2005, was signed for by an agent of DCAG.  Miller Decl., Ex. 3.

4          DCAG filed a motion to dismiss for insufficiency of service of process, pursuant to Federal Rule of

5   Civil Procedure 12(b)(5), and to dismiss for lack of personal jurisdiction, pursuant to Federal Rule of Civil

6   Procedure 12(b)(2).  Mot. at 1.  In response to plaintiffs' opposition, DCAG withdrew its challenge to

7   service of process, but continues to assert that the court must dismiss the complaint for lack of personal

8   jurisdiction.  The parties agree that plaintiffs' claim does not arise out of or relate to DCAG's purported

9   activity in California.  Mot. at 9; Opp'n at 8.  Thus, plaintiffs do not seek to establish specific jurisdiction

10  over DCAG.  *Id.*

11         Plaintiffs submitted a notice of filing of supplemental authority and exhibits on August 8,

12  2005 pursuant to Federal Rule of Civil Procedure 15(d).  Defendant filed an objection to its consideration.

13  The court sustains the defendant's objection to plaintiffs' supplemental materials, which were submitted

14  without prior court approval and in violation to Civil L.R. 7-3(d) (except for a new judicial opinion, "once a

15  reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval.").  If

16  the court considered plaintiffs' exhibits for the purpose of determining the existence of personal jurisdiction,

17  the supplemental materials would only add marginally to the calculus in favor of jurisdiction.

18                                    **II.  ANALYSIS**

19         The court may obtain personal jurisdiction over a defendant if it finds that either specific or general

20  jurisdiction exists.  Plaintiffs contend that the court has general jurisdiction over DCAG.  General

21  jurisdiction subjects a foreign defendant to suit within the forum state even on matters unrelated to its

22  contacts with the forum.  *Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001).  General jurisdiction

23  requires a two-part inquiry: (1) whether defendant has "systematic and continuous contacts" with California;

24  and (2) whether the assertion of general jurisdiction is reasonable.  *Helicopteros Nacionales de*

25  *Columbia, S.A. v. Hall*, 466 U.S. 408, 416 (1984); *Amoco Egypt Oil Co. v. Leonis Navigation Co.,*

26  *Inc.,* 1 F.3d 848, 851 (9th Cir. 1993).  Consequently, even if "continuous and systematic, contacts exist,

27  the assertion of general jurisdiction must be reasonable." *Gator.com Corp. v. L.L. Bean*, 341 F.3d 1072,

28  1079-80 (9th Cir. 2003) (citing *Amoco,* 1 F.3d at 852–53).  This case presents a difficult question: can a

1  federal court exercise personal jurisdiction over a case arising under federal subject matter jurisdiction in

2  which plaintiffs are all foreign nationals and the defendant is a foreign corporation which has subsidiaries

3  doing business in the United States?

4       Plaintiff has the burden of establishing that defendant has systematic and continuous contacts with

5  the forum state.  *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002);

6  *Unocal*, 248 F.3d at 923.  The standard for establishing general jurisdiction is "fairly high," requiring

7  defendant's contacts in the state to be of a sort that "approximate physical presence" within the forum state.

8  *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).  Conceptually,

9  plaintiff must establish that the defendant has been conducting business in California, not merely with

10  California.  *See Bancroft*, 223 F.3d at 1086.

11       When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding

12  an evidentiary hearing, the plaintiff need only make a prima facie showing of the jurisdictional facts to

13  withstand the motion.  *Unocal*, 248 F.3d at 922.  In order to make a prima facie showing, plaintiff must

14  allege facts which, if true, would be sufficient to establish personal jurisdiction.  *Id*.  If not directly

15  controverted, plaintiffs' version of the facts is taken as true for the purposes of the motion.  *Id*.  Conflicts

16  between the facts stated in the parties' affidavits must be resolved in plaintiff's favor during a prima facie

17  jurisdictional analysis.  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002).

18       Defendant has the burden of establishing that exercise of jurisdiction over it is unreasonable.

19  *Amoco*, 1 F.3d at 851.  To determine whether exercise of jurisdiction is reasonable, the following seven

20  factors are balanced: (1) the extent of defendant's purposeful interjection into the forum; (2) the burden on

21  the defendant of litigating in the forum; (3) the extent of conflict with the sovereignty of defendant's state; (4)

22  the forum state's interest in adjudicating the issue; (5) the most efficient judicial resolution of the dispute; (6)

23  the importance of the forum to plaintiff's interest in convenient and effective relief; and (7) the existence of

24  an alternate forum.  *Id.*

25       **A.      Systematic and Continuous Contacts**

26       Courts focus on two primary areas when applying the "systematic and continuous contacts" test.

27  First, they seek to determine whether there is "some kind of deliberate 'presence' in the forum state,

28  including physical facilities, bank accounts, agents, registration, or incorporation."  *Gator.com*, 341 F.3d at

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1  1077.  Second, courts "look at whether the company has engaged in active solicitation toward and

2  participation in the state's markets, i.e., the economic reality of the defendant's activities in the state." *Id.*

3  Plaintiffs seek to establish that DCAG has the requisite systematic and continuous contacts with California

4  by arguing that (1) DCAG itself has such contacts or (2) DCAG has sufficient contacts by virtue of

5  MBUSA, which plaintiffs contend acts as DCAG's agent.  Opp'n at 8.

6  **1.     DCAG's Objections to Evidence**

7        As a preliminary matter, DCAG objects to much of the evidence plaintiffs have submitted in

8  support of their contention that this court has personal jurisdiction over DCAG, particularly to documents

9  attached to the declaration of Brian Campbell.  First, DCAG objects that plaintiffs have not properly

10  authenticated certain materials submitted in support of their opposition and that the materials are thus

11  inadmissible as lacking foundation.  The materials to which DCAG objects on the basis of authentication are

12  pages printed from the www.daimlerchrysler.com website and a proxy statement and marketing brochure

13  purportedly distributed by DCAG.

14        Although some courts have refused to consider unauthenticated internet documents for purposes of

15  any motion, *see, e.g., Wady v. Provident Life and Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060

16  (C.D. Cal. 2002) (excluding internet evidence on a summary judgment motion for these reasons), this court

17  agrees with a recent Central District of California decision holding that the court should consider the stage

18  of litigation when determining the admissibility of unauthenticated evidence.  In *Moose Creek, Inc. v.*

19  *Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214 (C.D. Cal. 2004), the court considered unauthenticated

20  internet documents submitted by plaintiffs in support of their motion for preliminary injunction for trademark

21  infringement.  The court stated:

22
23          Rule 901(a) defines a standard of admissibility that is rather general or elastic: the evidence
   must merely be 'sufficient to support a finding that the matter in question is what proponent
   claims.'  Although Plaintiffs are correct that these internet documents are not individually
24  authenticated, the Court finds that at this stage they satisfy Rule 901(a).

25  *Id.* at 1225 n.4.  Likewise, the court will consider plaintiffs' unauthenticated documents for purposes of

26  determining whether DCAG is subject to personal jurisdiction.

27        Defendant also objects that the statements contained in the internet materials are offered for the

28  truth of their contents and are thus hearsay.   District courts have discretion to consider otherwise

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1   inadmissible evidence in ruling on an application for a temporary restraining order or preliminary injunction.

2   *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the

3   discretion of the district court to accept this hearsay for purposes of deciding whether to issue the

4   preliminary injunction.").  Other courts have held that hearsay may be considered for purposes of

5   determining personal jurisdiction, provided it bears circumstantial indicia of reliability. *Akro Corp. v.*

6   *Luker*, 45 F.3d 1541, 1546-47 (Fed. Cir. 1995) ("[E]ven if Luker had objected to the hearsay nature of

7   the statements at trial, such an objection would have been overruled, as we have held that hearsay

8   'bear[ing] circumstantial indicia of reliability' may be admitted for purposes of determining whether personal

9   jurisdiction obtains.") (citing *Beverly Hills Fan v. Royal Sovereign Corp.*, 21 F.3d 1558, 1562 (Fed. Cir.

10  1994)).  The court finds that the documents printed from the www.daimlerchrysler.com website bear such

11  circumstantial indicia of reliability, as the printouts bear the date and site from which they were printed,

12  along with the DaimlerChrysler banner style.[1]  The court will consider plaintiffs' evidence printed from the

13  DaimlerChrysler and MBUSA websites for the purpose of determining the existence of personal

14  jurisdiction.  The documents printed from other websites, however, do not bear these circumstantial indicia

15  of reliability.  The court sustains defendant's objection to the contents of Exhibits 5, 6, 7, 9, 10, 11, 12, 14,

16  20, and 21 to the Campbell declaration.

17              **2.      DCAG's Contacts**

18          Plaintiffs present evidence of nine of DCAG's contacts in support of their claim that DCAG has

19  continuous and systematic contacts with California.  Opp'n at 9.  DCAG, however, argues that plaintiffs

20  have incorrectly attributed five of those nine contacts to DCAG when, in fact, they are contacts by certain

21  subsidiaries of DCAG.  Reply at 3.  With regard to the remaining four contacts, DCAG argues that one

22  contact is not supported by plaintiffs' evidence and that the other three contacts are insufficient to establish

23  that DCAG has continuous and systematic contacts with California.  *Id.* at 4-5.

24

25

26

27

28

---

[1]          These documents could, in the alternative, be considered party admissions.

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1      **a.       Contacts Allegedly Attributable to Subsidiaries**

2            The parent-subsidiary relationship itself is not sufficient to attribute the contacts of the subsidiary to

3      the parent for jurisdictional purposes.[2]  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements, Ltd.*,

4      328 F.3d 1122, 1134 (9th Cir. 2003) (citing *Unocal*, 248 F.3d at 925).  Thus, only contacts that can

5      properly be attributed to DCAG, and not its subsidiaries, may be used to determine whether DCAG has

6      systematic and continuous contacts with California.

7            DCAG contends that plaintiffs wrongly attribute five contacts to it.  First, plaintiffs point to a

8      brochure published by DCAG in 2004, entitled *DaimlerChrysler Commitment to North America*.

9      Opp'n at 9.  In the section of this brochure entitled "Direct Economic Impact in North America – 2003,"

10     DCAG reported that it pays more than $64 million annually to 707 California employees, $15 million

11     annually to 1,562 California retirees, $1 billion total to California suppliers, and $31 million annually to

12     California in taxes.  Campbell Decl., Ex. 4 at 42.  Defendant, however, argues that the information in

13     *DaimlerChrysler Commitment to North America* refers to the North American contacts of DCAG-

14     affiliated subsidiaries and not those of DCAG.  Reply at 3-4.  Defendant claims that the entire brochure,

15     including the "Direct Economic Impact in North America – 2003 section," makes clear that it is discussing a

16     group of DaimlerChrysler affiliated subsidiaries located in North America.  *Id.* at 3.  In further support of its

17     argument that the brochure does not refer to DCAG's own direct impact in North America, DCAG submits

18     that it has no offices, agents, representatives, employees, property, or bank accounts in California.

19     Waskonig Decl. ¶¶ 3-4.  Aside from the brochure, plaintiffs have submitted no evidence to oppose

20     DCAG's assertion.

21           Consolidating the activities of a subsidiary into the parent's reports is a common business practice.

22     *Unocal*, 248 F.3d at 929 (quoting *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995)).  Such

23     consolidated statements are allowed by both the Internal Revenue Service and the Securities and Exchange

24     Commission and recommended by generally accepted accounting principles.  *Calvert*, 875 F. Supp. 679.

25     Thus, although *DaimlerChrysler Commitment to North America* begins with a letter signed by the

26

27     ─────────────

28           [2]       An exception to this general rule occurs when the subsidiary is the alter ego or agent of the
       parent.  Plaintiffs address this exception in the section of the analysis regarding MBUSA's systematic and
       continuous contacts.

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

8

1  Chairman of DCAG, which tells the reader that "this brochure highlights many of our North American

2  activities," the numbers published in *DaimlerChrysler Commitment to North America* do not serve to

3  establish that DCAG itself has California contacts.[3]

4      Second, plaintiffs point to an expenditure reported in DCAG's 2005 SEC 20-F filing of

5  approximately $595,000 for advertising and related marketing activities with Black Enterprise Magazine in

6  2004.  Campbell Decl., Ex. 15.  Because Black Enterprise Magazine has offices in California, plaintiffs

7  contend that this reported expenditure evidences a DCAG contact with California.  In response, DCAG

8  presents a declaration from its media purchasing affiliate stating that the amount cited by plaintiff was spent,

9  not on behalf of DCAG, but on behalf of three of its subsidiaries: DaimlerChrysler Motors Company LLC,

10  MBUSA, and Mitsubishi Motors North America, Inc.  Peter L. Swiecicki Decl. Supp. DCAG's Reply

11  ("Swiecicki Reply Decl.") ¶ 3.  Thus, the evidence does not support the conclusion that the reported

12  advertising expenditure may be properly attributed to DCAG.

13      DCAG's third alleged contact with California is its participation in the Stop Red Light Running

14  Campaign, in which it purportedly made grants worth $200,000 to seven communities in the United States,

15  including the City of Fresno, California.  Campbell Decl., Ex. 17.  Plaintiffs found the information in a press

16  release from "Auburn Hills/Stuttgart" on the DaimlerChrysler website.  *Id.*  DCAG contends that it was

17  DCC, not DCAG, that participated in the Stop Red Light Running Campaign.  Louann Van Der Wiele

18  Decl. Supp. DCAG's Reply ("Wiele Reply Decl.") ¶ 5.

19      Fourth, plaintiffs contend that DCAG filed for certification from the California Air Resources Board

20  for its engines.  The certification allegedly allows DCAG's products to be marketed in California.  Campbell

21  Decl., Ex. 8.  DCAG, however, contends that it does not make submissions to the California Air Resources

22  Board but that a distinct subsidiary company in the United States does so.[4]  Peter Waskonig Decl. Supp.

23  DCAG's Reply ("Waskonig Reply Decl.") ¶ 10.  The filing itself does not constitute a contact of DCAG

24

25        [3]     These numbers and documents may prove relevant to establishing DCAG's California

26  contacts where plaintiffs seek to demonstrate that a subsidiary is an agent or alter ego of DCAG.  *See, e.g., In Akzona Inc. v. E.I. Du PontNemours and Co.*, 607 F.Supp. 227, 238 (D.Del.1984), *cited in*

27  *Unocal*, 248 F.3d at 928 (finding parent corporation's annual report clearly indicated parent corporation's corporate status as separate from relevant subsidiary).

28        [4]     DCAG does not identify which subsidiary company performs this function.

1    with the forum state.  However, the impact of the filing, that DCAG's products may be marketed in

2    California, may be relevant, as set forth below.

3         Fifth, plaintiffs allege that DCAG directly participated in the establishment of the California Fuel Cell

4    Partnership, which involved Ferdinand Panik, Senior Vice President at DCAG, being present in California

5    as chairperson of the organization.  DCAG does not refute plaintiffs' allegation but contends first that the

6    evidence is inadmissible and that DaimlerChrysler Research and Technology North America, Inc., is the

7    only company in the DaimlerChrysler Group of companies that currently is a member of the California Fuel

8    Cell Partnership.  Waskonig Reply Decl. ¶ 9.

9         The court concludes that DCAG has presented sufficient evidence that these contacts are

10   attributable, not to DCAG, but to subsidiaries of DCAG.  Accordingly, they are not properly considered

11   direct contacts of DCAG to California.

12                **b.    California-specific product designs**

13        As a sixth contact with California, plaintiffs claim that DCAG designs vehicles specifically for

14   California, which indicates purposeful availment.  Opp'n at 10.  In support of this argument, plaintiffs offer

15   evidence that DCAG produces cars to meet California's air quality standards.  Campbell Decl., Ex. 11-12.

16   Plaintiffs also offer evidence that DCAG built a prototype fuel cell vehicle specifically for United Parcel

17   Service ("UPS") to use in California and that DCAG built a fuel cell for the California Fuel Cell Partnership,

18   which DCAG tested by driving 25,000 miles on California roads.  Campbell Decl., Ex. 13.  DCAG does

19   not deny that it produces cars to meet California's air quality standards or that it built a fuel cell for the

20   California Fuel Cell Partnership.  However, DCAG uses plaintiffs' evidence to demonstrate that Mercedes-

21   Benz vehicles sold in California have the same design, including emission-system design, as those sold

22   elsewhere in the United States.  Reply at 4.  DCAG also does not deny its activities with UPS but contends

23   that its Mercedes-Benz hydrogen fuel cell vehicles in California do not differ in design from those elsewhere

24   in the world and that its Mercedes-Benz hydrogen fuel cell vehicles are not sold to the public in California.

25   *Id.* at 4-5.

26        Designing a product specifically for the forum market has traditionally been helpful for establishing

27   purposeful availment for specific jurisdiction.  "Whether dealing with specific or general jurisdiction, the

28   touchstone remains 'purposeful availment' . . . [to] ensure[ ] that 'a defendant will not be haled into a

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts.'" *Gator.com,* 341 F.3d at 1076 (citing *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002)). However, purposeful availment alone is not enough to establish general jurisdiction; the purposeful availment itself must be systematic and continuous. *See, e.g., Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112-13 (1986); *Rockwell Int'l v. Costruzioni Aeronautiche Giovanni Agusta*, 553 F. Supp. 328, 331-32 (E.D. Pa. 1982); *see also Calvert,* 875 F. Supp. at 677 (concluding that evidence used to establish specific jurisdiction does not establish general jurisdiction unless it is continuous and systematic). Although plaintiffs' unrefuted evidence establishes that DCAG designed products that could be marketed in California, among other locations, and built prototypes for testing and use on California roads by UPS and others, this purposeful availment is not sufficiently systematic and continuous for the exercise of general jurisdiction.

### c.   Remaining Contacts

Of the nine contacts that DCAG allegedly has with California, the three remaining are not disputed by the parties, but DCAG contends that they do not support the assertion of general jurisdiction.

First, DCAG is listed on the Pacific Stock Exchange located in San Francisco, which plaintiffs allege gives DCAG countless benefits including access to innovative electronic trading technology, increased liquidity of its assets, and higher corporate visibility. Second, plaintiffs contend that DCAG has pursued enough litigation in California to retain permanent counsel in San Francisco. This litigation includes DCAG initiating actions in the federal courts of California challenging California's clean air laws and initiating additional actions in California to protect its patent rights. Opp'n at 10. Furthermore, DCAG answered a complaint in a case unrelated to this one but within this district and cross-complained after waiving service of process. Opp'n at 10. Third, as a corporate partner in the Global Nature Fund, DCAG has been participating in the Living Lakes Project at Mono Lake in California. Campbell Decl., Ex. 16. Part of this project involved DCAG employees or their family members traveling to Mono Lake to participate in a nature camp in 2003. *Id.*

The single trip by DCAG employees or their family members to Mono Lake, California, as part of DCAG's participation in the Living Lakes Project, cannot be regarded as a contact of continuous and systematic nature. *See Helicopteros*, 466 U.S. at 416 (reasoning that "the one trip to Houston by Helicol's

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1   chief executive officer for the purpose of negotiating the transportation-service contract with

2   Consorcio/WSH cannot be described or regarded as a contact of 'continuous and systematic' nature").

3   Neither is a listing on a stock exchange, without more, sufficient to confer general jurisdiction. *See Wiwa v.*

4   *Royal Dutch Petroleum Co.,* 226 F.3d 88, 97 (2d Cir. 2000).

5       The lawsuits that DCAG filed in California courts to challenge California's clean air laws and

6   protect its patents are likely central to DCAG's business functions but do not serve to establish contacts of

7   a continuous and systematic nature sufficient to confer personal jurisdiction.  For example, in *Calvert*, the

8   district court determined that the defendant demonstrated a kind of purposeful availment similar to that

9   necessary for the exercise of limited or specific jurisdiction by initiating a lawsuit in a California court.

10   *Calvert*, 875 F. Supp. at 677.  However, the court determined that a single defendant-initiated lawsuit

11   does not establish general jurisdiction because it was neither continuous nor systematic.  *Id.*  Similarly, in

12   *Soma Medical Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1296 (10th Cir. 1999), defendant

13   bank had filed a small number of financing statements, recorded several instruments, and filed five civil

14   cases in the forum state to recover monies and/or foreclose on trust deeds.  The court in *Soma* held that

15   those were not the kinds of activities which courts have found necessary to subject a defendant to general

16   jurisdiction.  *Soma Medical Int'l,* 196 F.3d at 1296.  While DCAG's lawsuits may be systematic in the

17   sense that they are part of a larger corporate business or litigation plan, there is no evidence of either a

18   larger corporate plan or such continuous and substantial litigation as to justify finding general jurisdiction

19   over DCAG.  Furthermore, retaining permanent counsel in California is "the type of ongoing contact

20   needed for general jurisdiction," but this contact alone is not sufficient to establish general jurisdiction over

21   DCAG.  *Calvert*, 875 F. Supp. at 677.

22             **d.**      **Conclusion**

23       The court finds that plaintiffs' allegations do not establish that DCAG has continuous and systematic

24   contacts with California.  Plaintiffs have failed to establish that DCAG has contacts approximating a

25   physical presence in California.  *See, e.g., Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)

26   (finding general jurisdiction when president of Philippines-based corporation maintained office, kept

27   company files, held director meetings, distributed salaries, and conducted other company business in the

28   forum state).  The contacts that plaintiffs allege in support of their contention that DCAG has continuous

1   and systematic contacts with California are not of the pervasive nature required to find general jurisdiction

2   over DCAG.  In *Helicopteros*, for example, the defendant had purchased more than $4 million in

3   equipment from a company in the forum state and sent management and maintenance personnel to receive

4   training at that company in the forum state.  *Helicopteros*, 466 U.S. at 411-12.  During this seven-year

5   period, the defendant had also negotiated a contract in the forum state and received $5 million in payments

6   from a bank located within the forum state.  *Id.*  However, the Supreme Court held that these contacts

7   were insufficient for establishing general jurisdiction over the defendant.  *Id.* at 418-19.

8        Plaintiffs have not demonstrated that DCAG has directly invested more in California than the

9   defendant in *Helicopteros*.  Plaintiffs also have not demonstrated that DCAG's Pacific Stock Exchange

10   listing, California litigation, participation in the Living Lakes Project, building a fuel cell for UPS, and helping

11   to establish the California Fuel Cell Partnership amount to contacts with the forum state that are greater than

12   those of the defendant in *Helicopteros*.  In *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84

13   F.3d 560, 573-74 (2d Cir. 1995) the court found that while the defendant's contacts standing alone were

14   not continuous and systematic, together they were sufficient to establish general jurisdiction.  However, this

15   is not the case here: even when DCAG's California contacts are considered as a whole, as the court did in

16   *Metropolitan Life Ins. Co.*, they fall short of establishing the systematic and continuous contacts necessary

17   for this court to have general jurisdiction over DCAG.

18        **3.        Agency Relationship with MBUSA**

19        Plaintiffs alternatively contend that DCAG has continuous and systematic contacts with California

20   through MBUSA's contacts.  Opp'n at 17.  MBUSA has its principal place of business in New Jersey and

21   is wholly-owned by DaimlerChrysler North America Holding Company ("DCNAHC"), a Delaware

22   corporation.  DCNAHC is a subsidiary of DCAG.  Waskonig Decl. ¶ 8.  MBUSA serves the United

23   States market as DCAG's exclusive Mercedes-Benz importer and sales agent for the United States.

24   Waskonig Decl. ¶ 7.  Plaintiffs point out that MBUSA is the single largest supplier of luxury vehicles to the

25   California car market, and that over 10 percent of all new vehicle sales in the United States take place in

26

27

28

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1  California.[5]  Furthermore, MBUSA has a regional office in Costa Mesa, California, a Vehicle Preparation

2  Center in Carson, California, and a Classic Center in Irving, California.  Campbell Decl., Ex. 19.  DCAG

3  does not dispute that MBUSA is subject to general jurisdiction in California but argues that MBUSA's

4  contacts cannot be imputed to DCAG.

5        A subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego

6  or where the subsidiary acts as the general agent of the parent.  *Rutsky*, 328 F.3d at 1134.  How the

7  courts determine whether a subsidiary is an alter ego or agent of the parent has undergone a gradual

8  evolution.  *See, e.g.*, *Unocal*, 248 F.3d at 925 (delineating two separate tests for alter ego and agency);

9  *Chan v. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1405-06 (9th Cir. 1994); *Kramer Motors, Inc. v. Br.*

10  *Leyland, Ltd.,* 628 F.2d 1175, 1177-78 (9th Cir. 1980) (finding that day-to-day control over the

11  subsidiary by the parent was required to find a subsidiary to be an alter ego or agent of the parent); *Wells*

12  *Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 422-24 (9th Cir. 1977) ("The common law

13  requirements of a 'general agency' demand that such substantial activities be carried on for the benefit of the

14  principal that, in some cases, those same activities may indeed be sufficient to render the principal himself

15  'present' under the 'continuous and systematic' test of *Perkins v. Benguet Consol. Mining Co.*, 342 U.S.

16  437, 445-46, 72 S.Ct. 413, 96 L.Ed. 485 (1952).").

17  **a.      Alter Ego**

18        To establish that the subsidiary is the alter ego of the parent corporation, the plaintiffs "must make

19  out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities

20  [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in

21  fraud or injustice.'"  *Rutsky*, 328 F.3d at 1134 (quoting *Unocal*, 248 F.3d at 926).  Plaintiffs do not seek

22  to demonstrate that MBUSA is an alter ego of DCAG.

23

24

25

26

27      [5]      This point is, however, unsupported by admissible evidence because the web pages
provided by plaintiffs supply only unauthenticated hearsay.  However, as DCAG does not directly refute

28  this evidence, the court will consider it for purposes of determining whether DCAG has sufficient minimum
contacts through MBUSA.

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

### b.       Agency

The Ninth Circuit in *Rutsky* described the agency test:

> To satisfy the agency test, plaintiffs must make a prima facie showing that the subsidiary represents the parent corporation by performing services "sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation . . . would undertake to perform similar services." The agency test permits the imputation of contacts where the subsidiary was either "established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself."

*Rutsky*, 328 F.3d at 1135 (citations omitted) (quoting *Chan v. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1405 (9th Cir. 1994)). In determining whether a subsidiary satisfies the agency test, the following factors may be relevant: (1) what percentage of the parent corporation's business comes from the subsidiary; (2) whether the parent corporation's only agent in the United States is the subsidiary; and (3) whether the parent corporation conducts marketing activities in the United States. *Chan,* 39 F.3d at 1406. Furthermore, while a parent corporation's day-to-day control over the subsidiary's activities may contribute to an agency finding, it is not the *sine qua non* of the agency test. *Modesto City Sch.* v. *Riso Kagaku Corp.*, 157 F. Supp. 2d 1128, 1134 (E.D. Cal. 2001) (analyzing *Unocal*); *see also Synopsys v. Ricoh Co.*, 343 F. Supp. 2d 883, 887 (N.D. Cal. 2003). As noted by the Ninth Circuit in *Unocal*, "'[t]he question to ask is not whether the American subsidiaries can formally accept orders for their parent, but rather whether, in the truest sense, the subsidiaries' presence substitutes for the presence of the parent.'" *Unocal*, 248 F.3d at 928-29 (quoting *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.,* 508 F.Supp. 1322, 1342 (E.D.N.Y.1981)).

Plaintiffs' evidence regarding the factors suggested in *Chan* is inconclusive. Based upon DCAG's declaration that MBUSA is the exclusive distributor of Mercedes-Benz vehicles in the United States, the court can infer that MBUSA must provide a significant amount of business to DCAG through the American automobile market. It is clear that MBUSA is not DCAG's only subsidiary in the United States (or even in California), however, it is certainly a subsidiary that engages in substantial activity by selling Mercedes-Benz products in the United States. Furthermore, DCAG argues that it does no advertising in the United States—all such advertising is performed by its subsidiaries. With regard to day-to-day control, plaintiffs have provided no evidence whatsoever that DCAG exercises operational control over MBUSA.

1     Thus, the court again turns to the question of whether MBUSA's presence in California "substitutes

2   for the presence of" DCAG.  To make this determination, a court should look to the main business of the

3   parent and subsidiary.  *See, e.g., Unocal*, 248 F.3d at 929.  If the business of the parent is carried out

4   entirely at the parent level, the subsidiary's activities are not imputable to the parent.  *Id.*  DCAG argues its

5   business is manufacturing Mercedes-Benz vehicles and parts.  MBUSA is not involved in this manufacturing

6   but purchases Mercedes-Benz vehicles in Germany (where title passes) and imports them into the United

7   States.  Waskonig Decl. ¶ 10.  DCAG has no control over the ultimate destination of the products in the

8   United States and none of the dealerships at which the vehicles are sold is a subsidiary of Mercedes-Benz.

9   *Id.*  DCAG also points out that even before MBUSA (and its predecessor entities) came into existence,

10  independent non-subsidiary companies distributed Mercedes-Benz vehicles in the United States.  *Id.*

11  Plaintiffs, on the other hand, argue that without MBUSA or another similar entity to import and sell its

12  products into the United States, DCAG would not be able to sell vehicles in the United States market.

13     On somewhat analogous facts, a Northern District of California court found an agency relationship

14  between Ricoh Company, a Japanese corporation with no sales in or other direct contacts with California,

15  and Ricoh Corporation, a subsidiary of Ricoh Company that functioned as its main marketing and

16  distribution arm for North and South America.  *Synopsys, Inc. v. Ricoh Co., Ltd.*, 343 F. Supp. 2d 883

17  (N.D. Cal. 2003).  The court found Ricoh Company subject to personal jurisdiction in California and

18  concluded that "it is evident that Defendant's multifaceted operations are necessary to its viability in the

19  forum and represent tasks Defendant would have to perform itself but for the existence of its subsidiaries

20  based in this forum or registered to do business here."  *Id.* at 887.  In the present case, without MBUSA or

21  another distributor, DCAG would not be able to sell Mercedes-Benz vehicles in California.  However, it is

22  not clear that it would be required to perform such functions itself to avail itself of the California, luxury-

23  vehicle market.  In contrast, Ricoh Company had three subsidiaries in California and another registered to

24  do business here.  It appears the tasks performed by these subsidiaries were ones the court felt Ricoh

25  Company would have had to perform itself but for the existence of its subsidiaries.  No evidence suggested

26  these operations were ones that could be performed, for example, by a wholly independent company.

27  Although admittedly a close question, the court concludes that the activities of MBUSA should not be

28  imputed to defendant for the purpose of establishing personal jurisdiction over DCAG.

### B. Reasonableness

Even assuming the existence of sufficient minimum contacts with the forum state to support the exercise of general jurisdiction, exercise of personal jurisdiction must nonetheless be reasonable. "For jurisdiction to be reasonable, it must comport with 'fair play and substantial justice.'" *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). As set forth above, the court considers seven factors in determining whether the exercise of personal jurisdiction is reasonable. *Amoco*, 1 F.3d at 851. DCAG claims that all seven factors militate against the exercise of jurisdiction.

#### 1. Purposeful Interjection into California

The first factor of the scope of defendant's purposeful interjection into the forum state favors exercising jurisdiction. "When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' it has clear notice that it is subject to suit there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). By initiating lawsuits in California courts to challenge the state's clean air laws and to protect DCAG's patents and other business interests, DCAG has purposefully availed itself of the privilege of conducting business within California. *See Calvert*, 675 F. Supp. at 677 (citing *Vorys, Sater, Seymour, & Pease v. Ryan*, 154 Cal. App. 3d 91, 94 (1984)). Additionally, the Supreme Court in *World-Wide Volkswagen* indicated that a corporation demonstrates purposeful availment when the sale of its product "is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other states." *World-Wide Volkswagen Corp.*, 444 U.S. at 297. Given that California consumers account for 10 percent of new vehicles purchased in the United States and that one of DCAG's subsidiaries is the single largest supplier of luxury vehicles to California, it is reasonable to infer that the sale of DCAG's vehicles, including Mercedes-Benz vehicles, in California is not an isolated occurrence but arises from the efforts of DCAG to serve the California market. Thus, on the basis of purposeful availment, exercise of personal jurisdiction over DCAG would not be unreasonable.

#### 2. Burden on DCAG of Litigating in California

The second factor tips in DCAG's favor. None of the events in question occurred in California, and there is no contention that any discovery will be conducted in California nor that any potential witnesses

are located here.  *See Rocke v. Can. Auto. Sport Club*, 660 F.2d 395, 399 (9th Cir. 1981)  (concluding that the occurrence of the alleged acts in Canada created substantial burden for the defendant to litigate in California because of the location of potential evidence and witnesses).  DCAG will be further burdened because this court will be unable to compel the attendance of any Argentine witness who is not a party in the case and not a current DCAG employee, for either trial or deposition testimony.  *See Doe v. Sun Int'l Hotels, Ltd.*, 20 F. Supp. 2d 1328, 1330 (S.D. Fla. 1998) (noting, in *forum non conveniens* context, that witnesses who are defendant's employees are under defendant's control); *Duha v. Agrium, Inc.*, 340 F. Supp. 2d 787, 796 (E.D. Mich. 2004) (noting, in *forum non conveniens* context, that the court cannot compel attendance of unwilling witnesses).  Lastly, as DCAG is a German corporation, it may incur unique burdens in defending itself in the United States legal system.  *Asahi*, 480 U.S. at 113.

DCAG's burden of having to defend itself under the United States' legal system, however, will likely be minimal as it is a sophisticated, global business, has previously litigated in California, retains permanent counsel in California, and has subsidiaries in California.  *See Wiwa,* 226 F.3d at 99 (finding that defendant foreign corporations would not be subject to great inconvenience in litigating in the forum state, despite the fact that the disputed events did not occur in the forum state, because defendants controlled a wealthy and far-flung business empire, had a physical presence in the forum state, had access to enormous resources, faced little or no language barrier, had litigated in the country on previous occasions, had a four-decade long relationship with one of the nation's leading law firms, were the parent companies of one of America's largest corporations, and had to defend themselves in New York City, which was "a major world capital").  It is not clear that the burden on DCAG of litigating in California presents an "inconvenience [that] is so great as to constitute a deprivation of due process." *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128-29 (9th Cir. 1995).  Thus, the burden alone will not overcome otherwise clear justifications for the exercise of jurisdiction.  *Id.*

### 3.     Conflict with Sovereignty of Argentina or Germany

Potential conflicts with another state's sovereignty, the third factor, also militate against the exercise of jurisdiction over DCAG.  This factor is given greater importance where the events giving rise to the suit occurred on the foreign state's territory and when a foreign state has explicitly voiced a sovereign interest in the case.  *See Harris Rutsky*, 328 F.3d at 1133 (finding sovereignty considerations cut against jurisdiction

1    where alleged tortious conduct of British defendants occurred in London); *Pac. Atl. Trading Co., Inc. v.*

2    *M/V Main Exp.*, 758 F.2d 1325, 1330 (9th Cir. 1985) (finding Malaysia's sovereign interest weighed

3    against jurisdiction "since the contract was executed in Malaysia by Malaysian citizens on forms supplied by

4    a Malaysian bank").  On the other hand, sovereignty considerations are given less importance where the

5    defendant has manifested an intent to serve and benefit from the United States market, for example, where

6    a foreign defendant maintains a continuing business relationship with its United States agent.  *Sinatra v.*

7    *Nat'l Enquirer, Inc.,* 854 F.2d 1199, 1200 (9th Cir. 1988).  Moreover, "the factor of conflict with the

8    sovereignty of the defendant's state 'is not dispositive because, if given controlling weight, it would always

9    prevent suit against a foreign national in a United States court.'"  *Id.* at 1199 (citing *Gates Learjet Corp. v.*

10   *Jensen*, 743 F.2d 1325, 1333 (9th Cir. 1984)).

11         In this case, DCAG argues that Germany has expressed concern that this suit may violate its

12   sovereignty rights by delaying service under the Hague Convention.  Mot. at 13.  Additionally, the conduct

13   giving rise to the suit occurred entirely outside of California.  These facts increase the importance of "the

14   conflict with sovereignty factor," while DCAG's manifested intent to serve and benefit from the United

15   States market by maintaining continuing business relationships with its multiple United States subsidiaries

16   decreases its importance.  Thus, the court concludes that this factor cuts slightly against the exercise of

17   jurisdiction over DCAG.

18              **4.       California's Interest in Adjudicating the Dispute**

19         The fourth factor requires consideration of California's interest in adjudicating the issue.  California

20   has little direct interest in adjudicating this suit.  None of the plaintiffs is a California citizen, DCAG is not a

21   California corporation, and the DCAG subsidiary allegedly involved in the human rights violations at issue

22   has absolutely no demonstrated connection with California.  However, Congress has expressed that human

23   rights violations are the business of federal courts.  *See Wiwa*, 226 F.3d at 106 (reasoning, in *forum non*

24   *conveniens* context, from TVPA legislative history that "Congress has expressed a policy of U.S. law

25   favoring the adjudication of such suits in U.S. courts"); *see also Presbyterian Church of Sudan v.*

26   *Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 339 (S.D.N.Y. 2003).  Thus, although the court concludes

27   that California has at least an abstract interest in adjudicating plaintiffs' dispute, its interest is only in a

28

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1    general goal of world-wide preservation of human rights.  On balance, this factor weighs against the

2    exercise of personal jurisdiction.

3                        **5.        Absence of an Alternative Forum**

4           Although typically listed as the seventh factor in the Ninth Circuit reasonableness analysis, the court

5    next evaluates the absence of an alternative forum because plaintiffs contend that this factor influences the

6    remaining two factors, efficient judicial resolution of the dispute and convenience and effectiveness of relief

7    for plaintiffs.  The plaintiffs bear the burden of showing the absence of an alternative forum.  *Harris Rutsky*,

8    328 F.3d at 1133.[6]

9           Plaintiffs claim that United States courts are the only courts that are empowered to hear their claims

10   against DCAG and that will allow them to obtain "necessary" evidence.  Opp'n at 19.  In support of this

11   argument, plaintiffs contend that both Argentina and Germany are unsuitable fora and will provide no

12   effective relief for plaintiffs' claims.  *Id.*  They further contend that there exists no other alternative forum in

13   which plaintiffs can proceed against DCAG and obtain effective relief.  *Id.* at 19-20.  DCAG, however,

14   asserts that Germany and Argentina provide alternative fora, especially since the Argentine claims process

15   is still open for victims of "Dirty War" crimes, like the plaintiffs in this case.  Mot. at 14-15.

16                       **a.        Argentina as an Alternative Forum**

17          Plaintiffs allege that they cannot bring their claims against DCAG in the Argentine legal system

18   because Argentine courts do not permit lawsuits against "juridical persons" like corporations and require a

19   court entrance fee of three percent of the total claim, which plaintiffs cannot afford.  Ricardo Sans Decl.

20   Opp. DCAG's Mot. ("Sans Decl.") ¶¶ 5, 14.  Specifically in regard to their claims of human rights violations

21   by DCAG, plaintiffs allege that the Argentine claims process, to which defendant refers, provides relief only

22

23   _____

24          [6]      In performing this evaluation, the court may consider "any relevant material or source,
     including testimony, whether or not submitted by a party or admissible under the Federal Rules of
     Evidence."  Fed. R. Civ. P. 44.1.  Accordingly, the court may consider expert testimony in determining the

25   law of a foreign jurisdiction.  *See also Lockman Foundation v. Evangelical Alliance Mission*, 930 F.2d
     764, 768 (9th Cir. 1991) (moving party may demonstrate adequacy of alternative forum's law through

26   affidavits and declarations of experts); *accord Zipfel v. Halliburton Co.*, 832 F.2d 1477 (9th Cir. 1987).
     DCAG objects to the admissibility of the testimony of plaintiffs' foreign law experts, arguing that plaintiffs'

27   experts' opinions are not adequately supported by the law.  DCAG submits competing expert declarations
     on Argentine and German law.  Because the court may consider testimony regarding foreign law

28   irrespective of admissibility, the court considers the foreign law declarations submitted by both sides, but
     notes plaintiffs' experts' lack of citation to statutory or other legal authority.

1  for illegal conduct by its government during the "Dirty War" but not for illegal conduct by private parties

2  during that period.  *Id.*  ¶ 6.  In addition, plaintiffs allege that Argentina has amnesty laws protecting entities

3  like DCAG that are accused of committing human rights violations during the "Dirty War."  *Id.* ¶ 9.

4  Plaintiffs support their contentions with the declaration of Mr. Monner Sans, their expert on Argentine law.

5  Sans' declaration cites no legal basis for his assertions.  *Id.* ¶ 6 ("[T]here are no legal provisions in force

6  under Argentine law to sue a corporation for its responsibility in the violation of human rights.").

7  DCAG, however, submits expert testimony on Argentine law by Jorge Daniel Ortiz that plaintiffs

8  can bring their claims against DCAG in the Argentine legal system because Argentina courts permit

9  corporations to be sued for "quasi-delicts" or "delicts," which may be either a criminal offense or a civil

10  wrong.[7]  Ortiz Decl. ¶¶ 6-7.  DCAG also asserts that Argentine law may exempt plaintiffs from paying the

11  court entrance fee through a procedure called "benefit to litigate without affording court fees."  *Id.* ¶ 9.

12  Specifically with regard to plaintiffs' human rights claims,  DCAG provides citations to statutory authority

13  supporting its contention that Argentina provides causes of action similar to those available in the United

14  States for human rights violations by corporations.  *Id.* ¶ 8.  Furthermore, DCAG contends that the

15  Argentine amnesty laws to which plaintiffs refer were annulled by the Argentine Congress in August of

16  2003.  *Id.* ¶ 16.  The court concludes that DCAG has cited sufficient authorities to refute plaintiffs'

17  contention that they may not bring their claims in Argentina.

18  However, plaintiffs allege that even if they were able to bring their claims in Argentina, they would

19  not be able to obtain evidence necessary to pursue their claims because Argentina cannot order discovery

20  or witness testimony from DCAG, and individuals located in Germany are beyond the reach of Argentine

21  courts.  Sans Decl. ¶¶ 5, 15.  DCAG, however, claims that plaintiffs would be able to collect and present

22  the evidence necessary to pursue their claims, although this procedure is not termed "discovery" in the

23  Argentine legal system.  Ortiz Decl. ¶ 11.  Discovery procedures that are not identical to those in the United

24  States but that are nonetheless adequate do not render an alternative forum inadequate.  *See Lockman*

25

26  _____

27      [7]      Pursuant to Article 1072 of the Argentine Civil Code, DCAG's Argentine law expert
    describes delicts as "every illicit act executed knowingly and with intent to damage another person or his
    rights."  Pursuant to Articles 1107-1123 of the Civil Code, the expert describes quasi-delicts as  illicit acts

28  committed with fault or negligence, including vicarious tort liability imposed upon employers.  Jorge Ortiz
    Decl. Supp. DCAG's Reply ("Ortiz Decl.") ¶ 7.

1   *Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir. 1991) (holding, for *forum non*

2   *conveniens* motion, that Japanese forum was adequate although discovery procedures were not identical to

3   those in the United States); *Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1484 (9th Cir. 1987) (finding, for

4   *forum non conveniens* motion, that Singapore was an adequate forum although depositions were allowed

5   only in certain circumstances); *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1352-53 (1st Cir. 1992)

6   (reasoning, for *forum non conveniens* motion, that an alternative forum ordinarily is not considered

7   inadequate merely because its courts afford different or less generous discovery procedures than are

8   available under American rules).

9          Finally, plaintiffs allege that the Argentine judiciary is subject to rampant corruption, that judicial

10   resolution is severely hindered in various ways, and that the plaintiffs, judges and witnesses involved in the

11   case would likely be subject to violent intimidation.  Sans Decl. ¶¶ 10-12.  Opp'n at 21-22.  They also

12   contend that the Argentine subsidiary of DCAG is a major contributor to Argentina's economy and would

13   thus be subject to favorable treatment by the Argentine courts.  Sans Decl. ¶ 8.  In response, DCAG

14   submits expert testimony refuting Sans' statement that "the most recent Report on Human Rights of the U.S.

15   State Department" is the 2003 version.  Ortiz states that the most recent version is the 2004 Report on

16   Human Rights of the U.S. State Department ("2004 Report"), which lacks "any reference to reports that

17   security forces are attempting to intimidate the judiciary, witnesses, or human rights organizations."  Ortiz

18   Decl. ¶¶ 12-13.  Ortiz further points out that the 2004 Report recognizes the Argentine government's

19   continued pursuit of anti-corruption measures and accountability for human rights violations that occurred

20   during the "Dirty War," with a Supreme Court ruling that crimes against humanity were not subject to

21   statutes of limitations.  *Id.* ¶ 14.

22          United States courts "have been reluctant to find foreign courts 'corrupt' or 'biased'" for the purpose

23   of deeming the foreign forum inadequate.  *See, e.g.*, *Monegasque De Reassurances S.A.M. v. Nak*

24   *Naftogaz of Ukr.*, 311 F.3d 488, 499 (2d Cir. 2002) (quoting *Blanco v. Banco Indus. de Venez., S.A.*,

25   997 F.2d 974, 981-82 (2d Cir. 1993)).  In *Blanco,* plaintiffs alleged that the Venezuelan justice system

26   contained systemic corruption and was biased in favor of defendants.  Furthermore, plaintiffs in Blanco

27   submitted evidence of political unrest in Venezuela.  The court, however, concluded that Venezuela was a

28   suitable alternative forum because "no convincing showing ha[d] been made of those 'rare circumstances'

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1    that render the proposed alternative forum 'clearly unsatisfactory.'" *Blanco*, 997 F.2d at 982 (quoting *Piper*

2    *Aircraft v. Reyno*, 454 U.S. 235, 254 n.22 (1981)).

3         Considering the number of cases that have concluded that the foreign forum is adequate may be

4    helpful in determining the adequacy of alternative fora.  *See Blanco,* 997 F.2d at 981-82; *Lockman*

5    *Found.*, 930 F.2d at 769 n.3 (considering other courts' findings as to whether alternative forum is

6    adequate).  DCAG cites a number of courts that have found Argentina to be a suitable forum,[8] however,

7    none of these cases evaluated suitability of the forum in a human rights context.  *See, e.g., Wiwa*, 226 F.3d

8    at 88 (recognizing that dismissal of ATCA claims on *forum non conveniens* grounds frustrates Congress'

9    intent to address human rights abuses).

10        The suggestion by DCAG's Argentine law expert that the 2004 Report indicates that judiciary and

11   witnesses in Argentina are not subject to intimidation is not supported by the text of the report.  Most

12   notably, the 2004 Report states, "Threats and beatings allegedly aimed to intimidate witnesses were

13   common and, in some cases, occurred in connection with killings believed committed by members of

14   security forces or their criminal allies," and "[t]here were credible allegations of efforts by members of

15   security forces and others to intimidate the judiciary and witnesses . . . [with] [a]llegations of corruption in

16   provincial courts . . . more frequent than at the federal level, reflecting strong connections between some of

17   the governors and judicial powers in their provinces." Ortiz Decl., Ex. A at 5.

18        These persisting conditions cause the court concern.  The question is whether this concern is

19   sufficient to find the Argentine forum inadequate.  For the court to find an alternative forum inadequate, that

20   forum must be characterized by a complete absence of due process or an inability of the forum to offer any

21   satisfactory remedy.  *See, e.g., Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y.

22   1983), *aff'd,* 767 F.2d 908 (2d Cir. 1985) (mem.); *see also Piper Aircraft*, 454 U.S. at 254.  Here, the

23   plaintiffs are asserting human rights violations by a corporation in cooperation with the Argentine military.

24   Although there is a possibility that the Argentine security forces may want to keep certain witnesses from

25

26

27
     _____

28        [8]     *See, e.g., Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1284 (11th Cir. 2001)
     (concerning product liability actions against aircraft manufacturer); *Duha*, 340 F. Supp. 2d at 801
     (concerning various contract and tort actions arising from employment termination).

1    testifying to DCAG's alleged acts, plaintiffs have not alleged a strong rationale for why witnesses in a case

2    against the corporation might be subject to such treatment.

3         DCAG has convincingly argued that plaintiffs would be able to file similar claims to those asserted

4    here, obtain the equivalent of adequate discovery, and receive appropriate damages.  Even in light of the

5    potential intimidation, plaintiffs have not made out a prima facie case that "the remedy provided by the

6    alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft*, 454

7    U.S. at 254.  Thus, Argentina provides plaintiffs an alternative forum, although, as set forth in further detail

8    below, it may not be the most favorable forum for obtaining relief.

9                                **b.    Germany as an Alternative Forum**

10        Plaintiffs also contend that they cannot bring their claims in German courts because German courts

11   fail to recognize either human rights actions against corporations or equitable tolling, without which plaintiffs'

12   claims would be barred by the statute of limitations.  Opp'n at 22; Wolfgang Kaleck Decl. Opp. DCAG

13   Mot. ("Kaleck Decl.") ¶ 5.  Plaintiffs additionally contend that Argentine citizens will not have access to

14   German courts for the purpose of filing suit against a German corporation for its illegal actions in Argentina.

15   Kaleck Decl. ¶ 5.  Even if plaintiffs were able to file suit in Germany, plaintiffs point out that German courts

16   cannot order document production.  *Id.*; Opp'n at 19-20, 22-23.[9]  DCAG denies plaintiffs' assertion that

17   German courts fail to recognize human rights actions against corporations, contending that German courts

18   recognize causes of action for human rights violations similar to those recognized in the United States.

19   Stefan Rutzel Decl. Supp. DCAG's Reply ("Rutzel Decl.") ¶¶ 6-26.  DCAG's German law expert, Dr.

20   Stefan Rutzel, further concludes that "none of [plaintiffs'] relevant causes of action causes an exclusive

21   jurisdiction of a court which would bar the jurisdiction of the German court." *Id.* ¶ 6.  Of significance,

22   however, DCAG does not refute plaintiffs' contention that their actions would be barred by the statute of

23   limitations in Germany.

24        Preclusion of a claim by the alternative forum's statute of limitations renders the alternative forum

25   inadequate.  *See Miracle v. N.Y.P. Holdings, Inc.*, 87 F. Supp. 2d 1060 (D. Haw. 2000); *Crimson*

26

27   _____

         [9]      Plaintiffs contend that DCAG made these arguments before the German courts in their
28   effort to halt service of process under the Hague Convention.  Aside from their expert's assertion, there is
     no other evidence on the record that this is so.

1   *Semiconductor, Inc. v. Electronum*, 629 F. Supp. 903, 909 (S.D.N.Y. 1986) (ruling, in *forum non*

2   *conveniens* motion, that foreign forum was unsatisfactory where statute of limitations bar in foreign forum

3   did not simply go to the merits of plaintiffs' claim or to the quantum of damages but to the very existence of

4   the claim). In the present case, undisputed expert testimony suggests that the assertion of plaintiffs' claims in

5   Germany would be barred by the lack of equitable tolling provisions for this type of claim under German

6   law. Thus, Germany does not appear to be an alternative forum available to the plaintiffs.

7              **6.       Efficient Judicial Resolution of the Dispute**

8              The court next evaluates the efficiency of alternative fora. Here, as set forth above, that alternative

9   forum is Argentina. In evaluating this factor, courts have looked primarily at where the witnesses and

10  evidence are likely to be located. *Ziegler v. Indian River County*, 64 F.3d 470, 475-76 (9th Cir. 1995)

11  (quoting *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1983)). As noted earlier, it

12  is undisputed that plaintiffs' alleged injuries did not occur in California, and plaintiffs do not contend that

13  relevant evidence is located in California. Thus, a consideration of the location of the dispute and evidence

14  does not initially favor California as the proper forum.

15             Plaintiffs also argue that this court provides the most efficient forum because proceedings here will

16  be conducted in English. Opp'n at 20. According to plaintiffs, DCAG officially conducts business in

17  English, thus making it efficient for the parties to adjudicate this dispute in United States courts versus

18  Argentine courts. *Id.* Were the dispute to be adjudicated in Argentina, DCAG's evidence would have to

19  be translated into Spanish. Even assuming that DCAG conducts business in English, however, this does not

20  account for the fact that plaintiffs are all Spanish speakers and that many of the alleged events occurred in

21  Argentina. Thus, if adjudicating in the United States, all Spanish language evidence would need to be

22  translated into English. This argument does not support plaintiffs' contention that the United States provides

23  the most efficient forum for resolution of this dispute.

24             However, the court notes that the 2004 Report states "while the judiciary is nominally independent

25  and impartial, some judges and judicial personnel were inefficient and, at times, subject to, and apt to

26  exercise political manipulation. [] The system was hampered by inordinate delays, procedural logjams,

27  changes of judges, inadequate administrative support, and incompetence." Ortiz Decl., Ex. A at 4. Thus,

28  DCAG's own evidence supports a conclusion that this court would provide the more efficient and

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1   trustworthy judicial system for resolution of the present dispute.  On the other hand, the witnesses and

2   evidence are not located here but are located in Argentina.  This factor is difficult to balance.

3                    **7.        Convenient and Effective Relief to Plaintiff**

4            Consideration of convenient and effective relief to plaintiffs favors jurisdiction, although it is

5   generally not given as much weight as the other factors.  *See Panavision*, 141 F.3d at 1316; *Core-Vent*,

6   11 F.3d at 1490.  As before, plaintiffs contend that only United States courts will hold DCAG accountable

7   for its alleged participation in the "Dirty War."  Thus, plaintiffs conclude that this forum will provide them

8   with the most convenient and effective relief.  Although this court does not agree with plaintiffs' contention

9   that the United States is the only adequate forum for their claims and, in fact, has found that Argentina

10  presents an alternative forum for plaintiffs' claims, the possibility of plaintiffs encountering intimidation in

11  Argentina for bringing a human rights suit involving actions by the Argentine government during its "Dirty

12  War" tips this factor in favor of plaintiffs.

13                    **8.        Conclusion**

14           Although the question is a close one, the court tentatively concludes that this court does not have

15  personal jurisdiction over DCAG.  However, before making a final decision, limited jurisdictional discovery

16  will be allowed on whether an agency relationship exists between DCAG and MBUSA and the ability of

17  plaintiffs to pursue their claims in Germany (e.g., is the claim barred by the statute of limitations?) or

18  Argentina (e.g. does Argentine law allow human rights claims against private parties acting in concert with

19  the government?)

20                              **III.  ORDER**

21           For the foregoing reasons, the court tentatively grants DCAG's motion to dismiss for lack of

22  personal jurisdiction.  However, before making a final decision, limited jurisdictional discovery may be

23  undertaken.  The parties may each submit up to twenty-five interrogatories and a narrowly tailored set of

24  requests for production on the jurisdictional issues.  A further hearing on the motion is hereby set for March

25

26

27

28

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1  24, 2006, at 9:00 a.m.  Any further briefing by plaintiff must be submitted by March 3, 2006, and any

2  further briefing by defendant by March 10, 2006.

3

4  DATED:_____11/22/05_____                         _____/s/ Ronald M. Whyte_____
                                                      RONALD M. WHYTE
5                                                      United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW

1    **Notice of this document has been electronically sent to:**

2    **Counsel for Plaintiffs:**

3    Kim E. Card                          kim@chavezgertler.com
     Daniel M. Kovalik                    dkovalik@uswa.org
4    Kathryn Chris Palamountain           chris@chavezgertler.com
     Derek J. Baxter                      Derek.Baxter@ilrf.org
5    Mark Andrew Chavez                   mark@chavezgertler.com
     Terry Collingsworth                  terry.collingsworth@ilrf.org
6
     **Counsel for Defendant:**
7
     Peter J. Messrobian                  peter.messrobian@sdma.com
8    Matthew J. Kemner                    mkemner@cbmlaw.com

9
     Counsel are responsible for distributing copies of this document to co-counsel that have not registered for
10   e-filing under the court's CM/ECF program.

11

12

13   Dated:  _____11/22/05_____          _/s/  JH_____
                                            **Chambers of Judge Whyte**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER TENTATIVELY GRANTING DEFENDANT'S MOTION TO DISMISS
C-04-00194 RMW