Corrected Reprint

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BARBARA BAUMAN; GREGORY
GRIECO; JOSEFINA NUNEZ; GABRIELE
NUNEZ; MIRIAM NUNEZ; SILVIA
NUNEZ; EMILIO GUILLERMO PESCE;
MIRTA HAYDEE ARENAS; GRACIELA
GIGENA; GUILLERMO ALBERTO
GIGENA; NURIA GIGENA; AMELIA
SCHIAFFO; ELBA LEICHNER;
ANUNCIACION SPALTRO DE
BELMONTE; HECTOR RATTO;
EDUARDO OLASIREGUI; RICARDO
MARTIN HOFFMAN; EDUARDO
ESTIVILLE; ALFREDO MANUEL
MARTIN; JUAN JOSE MARTIN; JOSE
BARREIRO; ALEJANDRO DAER,
             *Plaintiffs-Appellants,*

               v.

DAIMLERCHRYSLER CORPORATION;
DAIMLERCHRYSLER AG,
             *Defendants-Appellees.*

No. 07-15386

D.C. No.
CV-04-00194-RMW

OPINION

RECEIVED
MAY 19 2011
Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
October 21, 2008—San Francisco, California
Opinion Filed August 28, 2009
Opinion Withdrawn May 6, 2010
Resubmitted August 6, 2010

6555

6556      BAUMAN v. DAIMLERCHRYSLER CORPORATION

Filed May 18, 2011

Before: Mary M. Schroeder, Dorothy W. Nelson and
Stephen Reinhardt, Circuit Judges.

Opinion by Judge Reinhardt

## COUNSEL

Terrence Patrick Collingsworth and Natacha H. Thys, Conrad & Scherer, Washington, D.C., for the plaintiffs-appellants.

Matthew James Kemner, Carroll, Burdick & McDonough LLP, San Francisco, California, for the defendants-appellees.

## OPINION

REINHARDT, Circuit Judge:

### I.

Plaintiffs-Appellants (the "plaintiffs"), twenty-two Argentinian residents,[1] bring suit against DaimlerChrysler Aktiengesellschaft (DCAG) alleging that one of DCAG's subsidiaries, Mercedes-Benz Argentina (MBA)[2] collaborated with state

---

[1] One of the plaintiffs is a resident of Argentina, but a citizen of Chile; the other twenty-one are Argentinian citizens and residents.

[2] MBA was actually the subsidiary of DCAG's predecessor-in-interest, but neither party contends that there is any relevance to this distinction.

security forces to kidnap, detain, torture, and kill the plaintiffs and/or their relatives during Argentina's "Dirty War."[3] Some of the plaintiffs are themselves former employees of MBA and the victims of the kidnapping, detention, and torture, while others are close relatives of MBA workers who were "disappeared" and are presumed to have been murdered. The only question before us is whether the district court had personal jurisdiction over DCAG. The district court granted DCAG's motion to dismiss the case for lack of such jurisdiction. We conclude, however, that DCAG was subject to personal jurisdiction in California through the contacts of its subsidiary Mercedes-Benz USA (MBUSA). We hold that MBUSA was DCAG's agent, at least for personal jurisdictional purposes, and that exercise of personal jurisdiction was reasonable under the circumstances of this case.

## II.

### A.

The plaintiffs here were workers or relatives of workers at the Gonzalez-Catan plant of Mercedes-Benz Argentina (MBA), a wholly owned-subsidiary of DaimlerChrysler AG's predecessor-in-interest. The plaintiffs allege that MBA sought to brutally punish plant workers whom MBA viewed as union agitators, and that MBA collaborated with the Argentinian military and police forces in doing so. They also allege that MBA had knowledge that the result of this collaboration would be the kidnapping, torture, detention and murder of those workers, and that the plan was implemented, in part, in the following manner. First, MBA labeled the appellants as "subversives" and "agitators" and passed on this information to the state security forces. Second, MBA "had members of the military and police forces stationed within" the Gonzalez-

---

[3]The Dirty War in Argentina began in 1976 when the military overthrew the government of President Isabel Peron and set up a military dictatorship.

Catan plant. Third, MBA opened the plant to periodic raids by those forces. Fourth, MBA hired Ruben Lavallen, the police station chief who had been behind much of the reign of terror and installed him as Chief of Security, providing legal representation to him when he was "accused of human rights abuses." The plaintiffs further allege that MBA was pleased with the results of the raids and detentions because those actions helped to end a strike, restoring maximum production at the plant.

## B.

Plaintiffs brought suit against DCAG in the District Court for the Northern District of California under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victims Protection Act of 1991 ("TVPA"), 106 Stat. 73, note following 28 U.S.C. § 1350. After attempting to serve process at one of DCAG's headquarters in Stuttgart, Germany,[4] they learned that DCAG purported to maintain an operational headquarters in Auburn Hills, Michigan. They then attempted to serve DCAG in Michigan. *Bauman v. DaimlerChrysler AG (Bauman I)*, No. C-04-00194 RMW, 2005 WL 3157472, *2 (N.D. Cal. Nov. 22, 2005). DCAG moved to quash service and to dismiss the case for lack of personal jurisdiction. In support of its opposition to these motions, the plaintiffs submitted DCAG's proxy statement which stated that, following the merger of Daimler-Benz and Chrysler, DCAG would "maintain two operational headquarters—one located at the current Chrysler headquarters, 1000 Chrysler Drive, Auburn Hills, Michigan 48326-2766, and one located at the current Daimler-Benz headquarters, Epplestrasse 225, 70567 Stuttgart, Germany." The language referring to dual operational

---

[4] A German trial court authorized the service, but a German appellate court stayed the service so it could determine whether the service of process would infringe on Germany's sovereignty. *See Bauman v. Daimler-Chrysler AG (Bauman I)*, No. C-04-00194 RMW, 2005 WL 3157472, *1 (N.D. Cal. Nov. 22, 2005).

headquarters was repeated four times in the proxy statement. The plaintiffs also submitted a document from DCAG's website, entitled "Investor Questions and Answers."[5] This document also discussed the "dual operational headquarters" and went on to note that the Co-Chairmen and Co-Chief Executive Officers of DCAG, Jurgen E. Schrempp (former Chairman of DaimlerBenz AG) and Robert J. Eaton (former Chairman and CEO of Chrysler Corporation) both had "offices and staff in both locations." After this evidence was submitted, DCAG withdrew its motion to quash service. *Bauman I*, 2005 WL 3157472, at *2.

## C.

As discussed in more detail below, the District Court for the Northern District of California did not hold an evidentiary hearing when it ruled on DCAG's motion to dismiss for lack of personal jurisdiction; therefore, the plaintiffs "need *only* demonstrate facts that *if true* would support jurisdiction over the defendant." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001) (per curiam) (quoting *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995) (emphasis added).

---

[5]Although the defendants objected to these two documents as unauthenticated hearsay, the district court dismissed the objection, finding that it was appropriate to consider them at least for the purposes of determining personal jurisdiction. *Bauman I*, 2005 WL 3157472, at *5. The district court refused, however, to further examine some of plaintiffs' evidence, including the percentage of DCAG's worldwide sales that occurred through MBUSA in California and the overlap between the personnel of DCAG and MBUSA, because the court found that this evidence was not "relevant" to whether MBUSA was an agent of DCAG and thus was allegedly beyond the scope of supplemental briefing. *Bauman v. Daimlerchrysler AG (Bauman II)*, No. 04-00194, 2007 WL 486389, at *2 n.5 (N.D. Cal., Feb. 12, 2007). The plaintiffs had moved to file the evidence under seal in light of DCAG's declaration that this information was confidential, and the district court admitted the evidence into the record when it approved the filing of each of these additional items before its final order. Therefore, it is irrelevant whether the district court should have found that evidence to be "relevant;" the evidence was properly in the record below, and we may consider it in evaluating the agency relationship.

DCAG was a German stock company,[6] but according to
DCAG, sales of its vehicles in the United States "accounted
for 1% of the nation's Gross Domestic Product (GDP)." In the
annual report DCAG filed with the SEC in 2006, DCAG fur-
ther admits that "*a significant* portion of our business, primar-
ily in the case of the Mercedes Car Group, depends in part on
export sales to the United States." (emphasis added).
Mercedes-Benz USA, LLC ("MBUSA") was a Delaware lim-
ited liability company with its principal place of business in
New Jersey. MBUSA was a wholly-owned subsidiary of the
holding company DaimlerChrysler North America Holding
Corporation, which was, in turn, a wholly-owned subsidiary
of DCAG.[7] MBUSA was the single largest supplier of luxury
vehicles to the California market; according to DCAG's fig-
ures, MBUSA's sales in California alone accounted for 2.4%
of DCAG's total worldwide sales.

[6]Under the plaintiff-friendly standard at this stage of the litigation, it
appears that DCAG had dual operational headquarters in Stuttgart, Ger-
many and Auburn Hills, Michigan. DCAG vigorously disputes this.
Another federal court has also found that DCAG has dual headquarters in
Germany and in Michigan. *Tracinda Corp. v. DaimlerChrysler AG*, 364
F. Supp. 2d 362, 367 (D. Del. 2005). Because this contested fact is not
necessary to our ultimate decision, we do not rely on it. We do note, how-
ever, that if we did rely on it, it would add further support to our conclu-
sions.

[7]In 2007, DCAG was restructured when it sold its majority interest in
the Chrysler Car Group. This is irrelevant for purposes of this case, pri-
marily because DCAG's relation to MBUSA was not affected by the
restructuring (except that DCAG is now known as DaimlerBenz AG). In
addition, general jurisdiction is determined at the time the suit was filed.
*Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 422 (9th Cir.
1977). Of course this rule makes sense, otherwise companies could
restructure after the filing of large lawsuits for the sole purpose of escap-
ing liability. DCAG does not contend that the restructuring is relevant in
any of its filings before this court; in fact, DCAG acknowledges the
restructuring, but ascribes no importance to it. Moreover, in its response
to interrogatories, DCAG contends that the relevant relationship is the
relationship that existed "at the time the complaint was filed."

MBUSA had a regional office in Costa Mesa, California, a Vehicle Preparation Center in Carson, California, and a Classic Center in Irving, California. *Bauman I*, 2005 WL 3157472, at *10. Because of MBUSA's extensive contacts with California, DCAG does not dispute that MBUSA is subject to general jurisdiction in California. *Id.*

DCAG manufactured Mercedes-Benz motor vehicles and parts primarily at factories in Germany. MBUSA purchased Mercedes-Benz vehicles from DCAG in Germany for distribution in the United States.

Before DCAG created MBUSA, DCAG and its predecessors used two independent distributors to distribute Mercedes-Benz vehicles in the United States. From 1952 to 1957, Max Hoffman was the sole distributor of Mercedes-Benz vehicles; the relationship was terminated "[d]ue to low number of vehicle sales." From 1958-1964, an independent subsidiary of the Studebaker-Packard Corporation was the sole distributor. That company declared bankruptcy in 1964; that same year, the predecessor-in-interest to MBUSA became the exclusive U.S. distributor of Mercedes-Benz vehicles.

The final subsidiary that is relevant to this case is the DaimlerChrysler Corporation (DCC). As the district court noted, when the Chrysler Corporation and Daimler-Benz AG merged, they both became wholly-owned subsidiaries of DCAG. *Bauman I*, 2005 WL 3157472, at *1. At that point, Chrysler Corporation changed its name to DaimlerChrysler Corporation. *Id.*

## D.

The relationship between DCAG and MBUSA is governed by a General Distributor Agreement ("the Agreement") which establishes extensive requirements for MBUSA as the general distributor of Mercedes-Benz cars in the U.S.[8] Because the

---

[8]Many of the provisions in the Agreement also apply to MBUSA's Authorized Resellers. Because this case focuses on the relationship

Agreement is the critical legal document that defines DCAG's relationship with MBUSA, we will discuss its provisions at some length.

### Sales Figures

According to the Agreement, DCAG and MBUSA agree every year upon a set of quantitative and qualitative objectives, that can include a "minimum or specific number of Vehicles to be sold by [MBUSA] and its Authorized Resellers to end users . . . [and] a minimum or a specific market share in defined vehicle segments" in the United States.

### Sales Network

DCAG has extensive oversight over MBUSA's network of Authorized Resellers. MBUSA must "consult" with DCAG before establishing its sales and service network of Authorized Resellers, and before making *any* adjustments to that sales and service network. MBUSA must make "*any* changes or adjustments" to that network requested by DCAG. (emphasis added). MBUSA must receive approval from DCAG before entering into an agreement with any Authorized Reseller. According to the Agreement, "DCAG may, *in its sole discretion*, reject any such proposed appointment." (emphasis added). If DCAG approves of the appointment of the Authorized Reseller, then DCAG also must approve the location of "each retail sales outlet, showroom and service facility."

### Standards

MBUSA must also comply with all Dealership Standards promulgated by DCAG. MBUSA cannot appoint an Autho-

---

between DCAG and MBUSA, we will primarily discuss the provisions as they apply to MBUSA, although in some instances, for clarity's sake, we will discuss the provisions as they apply to MBUSA and its Authorized Resellers.

rized Reseller who does not agree to comply with the Dealership Standards. Moreover, DCAG has wide latitude to dictate MBUSA's behavior. MBUSA and its Authorized Resellers "shall comply with [DCAG's] requirements or such other manuals, guidelines or materials as may be from time to time implemented and amended or updated by [DCAG]."

## Business Systems

DCAG must approve of the accounting, order, inventory control and warranty claim processing systems used by MBUSA and its Authorized Resellers. DCAG must also approve of the "electronic data storage, transmission and communication system" used by MBUSA and its Authorized Resellers. MBUSA must further observe all of DCAG's "rules, terms and conditions" relating to the use of these business systems.

## Customer Information

DCAG dictates what customer information is to be collected by MBUSA. At DCAG's request, MBUSA must provide customer information to DCAG including "financial reports and operating statements, Parts sales and stock reports as well as customer databases and information."

## Management Personnel

According to the Agreement, MBUSA must employ a "General Manager, a Parts Manager, a Service Manager, and a Sales Manager." MBUSA cannot combine these positions without the "prior consent" of DCAG. These employees "shall not, without the prior consent of [DCAG], engage or participate in *operating*, selling or servicing, as the case may be, of any brand of vehicles other than" Mercedes-Benz vehicles. (emphasis added). DCAG must approve the replacements for any key personnel of MBUSA, and MBUSA must appoint such approved replacements within a reasonable time.

MBUSA personnel must participate in training offered or organized by DCAG. It is significant also that the Chairman of DCAG, Dieter Zetsche, was simultaneously the Chairman of MBUSA. Zetsche was also the head of the Mercedes Car Group at DCAG. There is at least one other instance of an MBUSA board member also serving on DCAG's board.

### Service

DCAG sets the standards and requirements for the vehicle servicing conducted by MBUSA and its Authorized Resellers. The servicing must comply with DCAG's Dealership Standards as well as DCAG's "requirements and other manuals, guidelines, or materials." MBUSA must establish, if DCAG requests, a Service Coordination Center "in conformity with the requirements of [DCAG]." Included in its responsibilities, this Service Coordination Center is to be responsible for "such other tasks as may be from time to time assigned by [DCAG]."

### Warranty

DCAG sets the warranty terms applicable to MBUSA. MBUSA may not provide additional warranties without the prior consent of DCAG. MBUSA must allow DCAG to access its facilities to observe the "performance or administration of warranty service."

### Vehicle Alteration

MBUSA cannot "alter or modify" any Vehicle without DCAG's "prior approval and then only in the manner [DCAG] authorizes," unless the vehicle has been ordered and the modification specifically requested by an end user.

### Technical Publications

MBUSA and its Authorized Resellers must each maintain an "organized library of [DCAG's] technical service publications."

### Promotion and Advertising

The Agreement requires MBUSA to "actively market" the Mercedes-Benz vehicles. The Agreement gives DCAG the discretionary power to conduct a yearly review of MBUSA's "comprehensive advertising and marketing plan." If DCAG exercises this right of review, MBUSA cannot pursue the advertising and marketing strategy without the approval of DCAG. MBUSA's marketing strategy, as well as its advertising and promotional materials must be consistent with both the Dealership Standards and DCAG's "brand representation and identification standards;" it must also comply with DCAG's "directives, standards, and processes as may be issued by [DCAG] from time to time." Furthermore, "[u]pon [DCAG's] request, [MBUSA] and its Authorized Resellers shall immediately stop advertising, promotion, or other marketing activities which (*in the sole opinion* of [DCAG]) do not comply" with DCAG's guidelines or standards. (emphasis added). Finally, DCAG can require MBUSA and its Authorized Resellers to participate in dealer advertising programs, associations, and parts merchandising programs.

### Signage

MBUSA and its Authorized Resellers must display "appropriate signs and fascia" to identify each facility. DCAG "reserves the right to approve or disapprove of each sign's type, design and size." Moreover, DCAG may implement a signage program whereby DCAG "designs, acquires and arranges for the installation of pre-approved signs" at MBUSA and its Authorized Resellers' facilities. DCAG may also force MBUSA and its Authorized Resellers to sell any signage that they own to DCAG.

### Prices

Although the sales *volume* is set yearly by agreement between DCAG and MBUSA, DCAG has the authority to

unilaterally set and change *prices*. DCAG simply must "notify" MBUSA "from time to time of the prices and charges for Contract Goods." Even though the Agreement locks MBUSA into a precise sales amount on an annual basis, DCAG may change the prices "at any time, and make the changes effective immediately." DCAG even has the power to force MBUSA to modify the prices that MBUSA charges to its Authorized Resellers for the vehicles MBUSA sells to those Authorized Resellers. Furthermore, MBUSA and its Authorized Resellers must comply with "any pricing policies" established by DCAG. DCAG may also change the "discounts and/or bonuses" it grants to MBUSA with one year's notice.

### MBUSA's Authority and Ownership

MBUSA must request the approval of DCAG before it changes its management control or ownership interests, the name or form of its legal entity, or the location of its principal place of business.

### Working Capital

MBUSA and its Authorized Resellers must maintain a "working capital level and financing capability" level that is "acceptable" to DCAG. In fact, "[a]t no time may [MBUSA's] working capital dedicated to its operations related to the Contract Goods be less than the amount specified by [DCAG] from time to time."

### Customer Satisfaction Policies

MBUSA must participate in any "program and rating scheme with regard to customer satisfaction policies" requested by DCAG.

### Other Goods

MBUSA may not manufacture motor vehicles or parts, or sell any vehicles not listed in the Agreement.

*Vehicle Homologation*

MBUSA must assist DCAG with vehicle distribution and vehicle homologation (the process of ensuring that vehicles comply with applicable regulations).

*Sales Numbers*

DCAG requires MBUSA to "make all reasonable efforts" to limit the amount of Mercedes-Benz vehicles sold by any Authorized Reseller or group of Resellers to 15% of the total sales of Mercedes-Benz vehicles in the United States.

*Trademark*

DCAG retains full ownership of the "Mercedes-Benz" trademark.

*Related Agreements*

DCAG can require MBUSA and its Authorized Resellers to execute "*any agreement* relating to . . . any other matter related to this Agreement in the form from time to time adopted by [DCAG]" as long as those Agreements are not an "unreasonable burden" on MBUSA.

**E.**

On November 22, 2005, the district court issued an order "tentatively granting defendant's motion to dismiss" for lack of personal jurisdiction. *Bauman I*, 2005 WL 3157472. The district court applied the two part test for general jurisdiction developed in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984): 1) whether defendant had "systematic and continuous" contacts with California, and 2) whether the assertion of general jurisdiction was reasonable. The district court found that it did not have general jurisdiction over DCAG because DCAG did not have "systematic and

continuous contacts" with California; *Bauman 1*, 2005 WL
3157472, at *9, the court found that DCAG itself did not have
such contacts and, moreover, that the plaintiffs had failed to
show that MBUSA was DCAG's agent such that MBUSA's
contacts could be imputed to DCAG. *Id.* at *12.

The district court acknowledged that "without MBUSA or
another distributor, DCAG would not be able to sell
Mercedez-Benz vehicles in California." *Id.* at *12. In deciding
that there was no agency relationship, however, the district
court relied heavily on its conclusion that "it is not clear that
[DCAG] would be required to perform such functions itself to
avail itself of the California, luxury-vehicle market." *Id.* The
district court admitted that the agency question was a "close
question," but found that MBUSA's contacts should not be
imputed to the defendant. *Id.*

In its tentative order, the district court also found that per-
sonal jurisdiction over DCAG would not be reasonable,
although it made a number of factual findings that caused it
to question the correctness of that finding. It found that
DCAG had purposefully interjected itself into California by
"initiating lawsuits in California courts to challenge the state's
clean air laws and to protect DCAG's patents and other busi-
ness interests." *Id.* at *13. Moreover, it found that the sale of
DCAG's vehicles in California "is not an isolated occurrence
but arises from the efforts of DCAG to serve the California
market." *Id.* The district court recognized that DCAG would
be slightly burdened if it was forced to litigate the case in the
United States; but, it found that the burden would be "mini-
mal" because DCAG "is a sophisticated, global business, has
previously litigated in California, retains permanent counsel
in California, and has subsidiaries in California." *Id.* The dis-
trict court concluded "that California has at least an abstract
interest in adjudicating plaintiffs' dispute," but found that
California had "little direct interest" in adjudicating the case.
*Id.* at *14. The district court decided that the other factors in
the reasonableness inquiry were either "difficult to balance"

or weighed "slightly" in favor of the plaintiffs or of DCAG. *Id.* at \*14, \*19. The district court tentatively held that exercise of personal jurisdiction would be unreasonable, however, primarily because it found that Argentina was available as an alternative forum. *Id.* at \*15-\*17. Because the question was a close one, the district court did not issue a final decision; instead, it allowed for limited jurisdictional discovery regarding the agency relationship between DCAG and MBUSA and the availability of Argentina and Germany as alternative fora. *Id.* at \*20.

On February 12, 2007, following the limited jurisdictional discovery, the district court issued its final order granting DCAG's motion to dismiss.[9] *Bauman II*, 2007 WL 486389, at \*1. The court wrote that it "conclude[d]" that distribution is not a task that DCAG would have to undertake itself, but for the existence of MBUSA, and therefore, the court found that "this mean[t]" that the court lacked personal jurisdiction over DCAG. *Id.* at \*2. The court, however, went on to hold that it did "*not need to reach this conclusion*, as DCAG has demonstrated that both Argentina and Germany provide plaintiffs with an adequate alternative forum for their claims."[10] *Id.* (emphasis added).

---

[9]The district court did not consider plaintiffs' argument, raised for the first time after the district court's tentative order, that there was nationwide personal jurisdiction over DCAG under Federal Rule of Civil Procedure 4(k)(2). *Bauman II*, 2007 WL 486389, at \*6. It also did not consider plaintiffs' argument that if the court found no personal jurisdiction in California, it should transfer the action to the federal district court in Eastern Michigan pursuant to 28 U.S.C. § 1406. *Id.* Because we find that plaintiffs have made a prima facie showing of personal jurisdiction over DCAG, it is unnecessary for us to consider those arguments or to decide whether, as DCAG contends, plaintiffs have waived those arguments by failing to raise them at an earlier stage in the district court proceedings.

[10]The district court included a cursory mention of exhaustion requirements under the TVPA in its reasonableness analysis. *Bauman II*, 2007 WL 486389, at \*3. Because we decide, as discussed below, that Argentina is not an "adequate" alternative forum, we need not decide whether the

The appellants timely appealed, asserting that the district court erred in finding that it lacked jurisdiction over DCAG.

## III.

DCAG argued in the district court that the court did not have personal jurisdiction over DCAG or subject matter jurisdiction over plaintiffs' claims. The district court chose to resolve the personal jurisdiction question first. The district court's discretionary decision to do so was proper. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[t]here is no mandatory sequencing of jurisdictional issues . . . [A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999) (internal quotation marks omitted)). Therefore, the only question before us is whether the district court had personal jurisdiction over DCAG.

We review a dismissal for lack of personal jurisdiction *de novo. Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788

---

district court properly addressed this issue when it included it as an aside in its reasonableness analysis. Also, because we find that Argentina is not an adequate alternative forum, we hold that DCAG has not shown that the asserted remedy in Argentina is "available, effective, and not futile." *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 832 (9th Cir. 2008) (en banc) (plurality). Moreover, plaintiffs bring claims under the ATS and the TVPA. Even if the plaintiffs had failed to properly exhaust claims, that would affect only their TVPA claims, and the district court's brief mention of exhaustion discussed only those claims. *Bauman II*, 2007 WL 486389, at *3. As for the ATS claims, we have held that exhaustion under the ATS is prudential rather than statutory. *Sarei v. Rio Tinto, PLC*, 550 F.3d at 832 n.10. Therefore, "exhaustion under the ATS should be approached consistently with exhaustion principles in other domestic contexts. The defendant bears the burden to plead and justify an exhaustion requirement, including the availability of local remedies." *Id.* at 831-32. Here, DCAG did not plead the exhaustion issue as an affirmative defense before the district court nor does it argue exhaustion before us.

F.2d 535, 538 (9th Cir. 1986). In doing so, we apply the following rule: "[w]hen a district court acts on a . . . motion to dismiss [for lack of personal jurisdiction] without holding an evidentiary hearing, the plaintiff need make only a *prima facie* showing of jurisdictional facts to withstand the motion." *Unocal*, 248 F.3d at 922 (emphasis added) (first alteration in original) (quoting *Ballard*, 65 F.3d at 1498). In other words, when as here, the district court did not hold an evidentiary hearing, the plaintiffs "need *only* demonstrate facts that *if true* would support jurisdiction over the defendant." *Id.* (emphases added).

### IV.

In evaluating the appropriateness of personal jurisdiction over a nonresident defendant, we ordinarily examine whether such jurisdiction satisfies the "requirements of the applicable state long-arm statute" and "comport[s] with federal due process." *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1404-05 (9th Cir. 1994). Because California "permits the exercise of personal jurisdiction to the full extent permitted by due process," *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000), we need only determine whether jurisdiction over DCAG comports with due process. *See Unocal*, 248 F.3d at 923.

Before doing so, we note that "[t]here are two types of personal jurisdiction: general and specific." *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995). Specific jurisdiction is only relevant if the defendant's "contacts with the forum give rise to the cause of action before the court." *Unocal*, 248 F.3d at 923. By contrast, "when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State," the State is exercising "general jurisdiction over the defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 415 n.9 (1984) (citations and internal quotation marks omitted). The parties agree that the claims here do not arise out of DCAG's con-

tacts with California, and the plaintiffs press only general jurisdiction over DCAG.

We therefore turn to an examination of whether general jurisdiction over DCAG in California comports with due process; in doing so, we conduct a two-part inquiry. First, we examine whether "the defendant ha[d] the requisite contacts with the forum state to render it subject to the forum's jurisdiction." *Unocal*, 248 F.3d at 925 (quoting *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 (9th Cir.1993)). Second, if it did, we then turn to an examination of whether the assertion of jurisdiction is fair and reasonable. *Id.*

## A.   Requisite Contacts

[1] In determining the requisite contacts of a defendant, we look to whether its activities in the forum are " 'substantial' or 'continuous and systematic,' even if the cause of action is unrelated to those activities." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990) (quoting *Data Disc, Inc. v. Systems Tech. Ass'n*, 557 F.2d 1280, 1287 (9th Cir. 1977)). In other words, we ask whether a defendant's "continuous corporate operations within [the] state are . . . so substantial and of such a nature as to justify suit against the defendant on causes of action arising from dealings entirely distinct from those activities." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (quoting *Int'l Shoe Co v. Wash.*, 326 U.S. 310, 318 (1945)) (quotation marks and brackets omitted). Here, there is no doubt that MBUSA has the requisite contacts.[11] The question is whether MBUSA's extensive contacts with California warrant the exercise of general jurisdiction over DCAG.

---

[11]Both parties agree that courts in California have general jurisdiction over MBUSA.

[2]   Under the controlling law, if one of two *separate* tests is satisfied, we may find the necessary contacts to support the exercise of personal jurisdiction over a foreign parent company by virtue of its relationship to a subsidiary that has continual operations in the forum. The first test, not directly at issue here, is the "alter ego" test. It is predicated upon a showing of parental *control* over the subsidiary. The two prongs of the "alter ego" test are as follows:

> (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice. The first prong of this test has alternately been stated as requiring a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former.

*Unocal*, 248 F.3d at 926 (internal citations, quotation marks, and brackets omitted). The second test, which *is* applicable here, is the "agency" test. That test is predicated upon a showing of the *special importance* of the services performed by the subsidiary:

> The agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have *a representative* to perform them, the corporation's own officials would undertake to perform substantially similar services.

*Id.* at 928 (quoting *Chan*, 39 F.3d at 1405) (emphasis added) (internal quotation marks omitted); *see also Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003). For the agency test, we ask: Are the services provided by MBUSA sufficiently important to DCAG that, if MBUSA went out of business, DCAG would continue

selling cars in this vast market either by selling them itself, or alternatively by selling them through a new representative? We answer this question in the affirmative. In addition, this test requires the plaintiffs to show an element of control, albeit not as much control as is required to satisfy the "alter ego" test.[12] We conclude that DCAG has more than enough control to meet the agency test, because DCAG has the right to control nearly every aspect of MBUSA's operations.

### Application of the Agency Test

#### 1.   Sufficient Importance

Our agency test for personal jurisdiction over a foreign corporation on the basis of its subsidiary's operations has its origins in case law from the Second Circuit. *See Wells Fargo &*

---

[12]The cases that might be read to require a more stringent showing of control do so only when describing *both* the agency and alter ego tests without differentiating between them. *See e.g., Unocal*, 248 F.3d at 926 ("An *alter ego or agency* relationship is typified by parental control of the subsidiary's internal affairs or daily operations.") (emphasis added); *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980) (per curiam) ("[t]hese facts are insufficient to make [the parent] an *'alter ego' or 'agent'* . . . [because the parent company does not] control[ ] the internal affairs . . . [nor] determine[ ] how [the subsidiary] operates on a daily basis") (emphasis added). The *Unocal* court did not rely on control for its agency analysis; instead it relied only on the sufficiently important test as discussed above. *See id.* at 928. The court merely noted that the level of control exercised by Unocal was not enough to overcome the plaintiffs' *failure* to demonstrate "sufficient importance." *See id.* at 929-30. Here, as discussed further below, the plaintiffs have sufficiently demonstrated the importance of MBUSA's services to DCAG. Moreover, because of DCAG's comprehensive right to control MBUSA's operations, it is clear that this relationship easily meets the agency test, and thus we need not define the precise degree of control required to meet that test or establish any particular method for determining its existence. We prefer to follow the traditional case-by-case common law method for refining these questions in the future. *See, e.g., Wells Fargo*, 556 F.2d at 426 ("[I]t must be cautioned that questions of personal jurisdiction admit of no simple solutions" and often "must be decided on a case-by-case basis.").

*Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 423 (9th Cir. 1977) (adopting agency theory of personal jurisdiction, with extensive reliance on case law from the Second Circuit). The purpose of examining sufficient importance is to determine whether the actions of the subsidiary can be understood as a manifestation of the parent's presence. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 318 (1945); *Wells Fargo*, 556 F.2d at 423. Presence is a well-established basis for general jurisdiction: an individual who is physically present in a state is subject to the jurisdiction of its courts on any matter. *Int'l Shoe*, 326 U.S. at 316 (1945).

Our starting point for the sufficient importance prong is that a subsidiary acts as an agent if the parent would undertake to perform the services itself *if it had no representative at all* to perform them. *Unocal*, 248 F.3d at 928 (finding agency if the services are "sufficiently important to the foreign corporation that if it did not have *a representative* to perform them, the corporation's own officials would undertake to perform substantially similar services") (quoting *Chan*, 39 F.3d at 1405) (emphasis added).[13] As the Second Circuit

---

[13]Admittedly, there is a lack of clarity and consistency in the previous articulations of the "sufficient importance" test. Some language in our *Unocal* opinion would appear to require that without the *particular* subsidiary's services, the parent company would have to undertake the agent's activities *itself*, perhaps through the use of its own personnel. *See Unocal*, 248 F.3d at 928 ("[C]ourts have permitted the imputation of contacts where the subsidiary was either established for, or is engaged in, activities that, but for the existence *of the subsidiary*, the parent would have to undertake itself.") (quoting *Chan*, 29 F.3d at 1405 n.9) (emphasis added) (internal quotation marks omitted). This language, taken from a footnote in the *Chan* opinion that quotes a district court opinion from the Eastern District of Pennsylvania, could be read to suggest that as long as the subsidiary's services could be performed equally effectively by an independent contractor, no agency relationship can exist. That is contrary, however, to the main thrust of both the *Unocal* and *Chan* opinions, and such a reading would make little sense in a complex global economy. Companies can delegate most necessary services to other entities to perform on their behalf, but that does not mean that the entities performing

explained, a court "may assert jurisdiction over a foreign corporation" when it affiliates itself with a local entity whose services "are sufficiently important to the foreign entity that the corporation itself would perform equivalent services *if no agent* were available." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (emphasis added).

[3] Selling Mercedes-Benz vehicles is a critical aspect of DCAG's business operations; DCAG's charter defines its goals as the "development, manufacture, and *sales* of products." (emphasis added). When this suit was filed, the United States market accounted for 19% of the sales of Mercedes-Benz vehicles worldwide, and MBUSA's sales in California alone accounted for 2.4% of DCAG's total worldwide sales. DCAG simply could not afford to be without a U.S. distribution system.

[4] The services that MBUSA currently performs are sufficiently important to DCAG that they would almost certainly be performed by other means if MBUSA did not exist, whether by DCAG performing those services itself or by DCAG entering into an agreement with a new subsidiary or a non-subsidiary national distributor for the performance of those services. As we held in *Wells Fargo*, "it is clear that whether the alleged general agent was a subsidiary of the principal or independently owned is irrelevant." 556 F.2d at 423. Independent contractors may be considered representatives, and contracting with an independent contractor to achieve the same end — distributing cars in the United States — means, in practice, obtaining a "representative" to "under-

those services are not or cannot be agents of the delegating company. Accordingly, we accept the more reasonable statement of the *Unocal* court quoted in the text above, which was drawn from the text of the *Chan* opinion and constitutes a more complete statement of the proposition relied on by those cases; equally important, it is consistent with the Second Circuit's rule.

take . . . substantially similar services." *Unocal*, 248 F.3d at 928 (quoting *Chan*, 39 F.3d at 1405).

**[5]** Therefore, the plaintiffs have established the importance to DCAG of the services performed by MBUSA and met the sufficiently important test, because even if DCAG were to replace MBUSA with an independent entity, that entity would still be considered a representative for purposes of that test.

### 2.   Control

We turn now to an examination of the element of control. As we have stated, *supra*, the principal focus of our agency test for purposes of personal jurisdiction is the importance of the services provided to the parent corporation. In *Unocal*, we conducted a thorough analysis of a potential agency relationship and based our decision solely on the failure to meet the sufficient importance test. *Id.* at 928-31. We then added that control alone was insufficient to overcome that failure.

**[6]** Control nevertheless plays a role in determining whether personal jurisdiction is established because control is a traditional element of agency under common law principles. DCAG contends that a right to control is not sufficient, and that the parent must actually exercise control over the operations of its subsidiary on a day-to-day basis in order to meet the agency test. This argument is in error because it conflates the agency and alter ego tests. We have previously explained that these two tests are distinct and involve considerations of distinct factors. *Wells Fargo*, 556 F.2d at 425.[14] As explained in the Restatement (Third) of Agency:

---

[14]As discussed above, the alter ego test requires a showing that the "parent controls the subsidiary 'to such a degree as to render the latter the mere instrumentality of the former.' " *Unocal*, 248 F.3d at 926 (quoting *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995)). A similar degree of control is not required to establish agency.

> A principal's right to control the agent is a constant across relationships of agency, but the content or specific meaning of the right varies. Thus, a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment. *A principal's failure to exercise the right of control does not eliminate it*, nor is it eliminated by physical distance between the agent and principal. . . .

§ 1.01 cmt. c. (emphasis added).

As we recently held, "[t]o form an agency relationship, both the principal and the agent must manifest assent to the principal's *right to control* the agent." *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) (emphasis added). We went on to make clear that actual control was not necessary by noting that a principal must either "actually control[ ]" the agent, *or* the principal and the agent must agree that the principal has the *right* to do so. *Bonds*, 608 F.3d at 506. We can think of no clearer manifestation of assent to the principal's right to control than the comprehensive written agreement between DCAG and MBUSA.[15]

[7] Even at common law, agents may exercise a considerable amount of discretion in performing their functions. *See* Restatement (Third) of Agency § 2.01, cmt. d (2006). A principal has control when it "has *the right* to give interim instructions or directions to the agent once their relationship is established." § 1.01 cmt. f (emphasis added). Indeed, the principal need not *exercise* control at all in order to preserve an

---

[15]The mere "capacity" to control is not sufficient to establish agency, absent some indication of an agreement that the principal has the right to control the agent. *Bonds*, 608 F.3d at 506. Although that agreement need not be explicit, "there must be at least some manifestation of assent" to the right to control. *Id.* at 507.

agency relationship; the relevant inquiry, rather, is whether the principal has the *right* to control. *See, e.g., Bonds*, 608 F.3d at 506; *In re Coupon Clearing Service, Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997) (holding that "[t]he right to control, rather than its exercise, is sufficient to meet [the agency] standard" under California law).

The Second Circuit's test does not require that "the defendant exercise[ ] direct control over its putative agent." *Wiwa*, 226 F.3d at 95. In fact, the Second Circuit relies on the sufficient importance test without requiring any control. *Id.* We do not go so far, however. For the reasons explained above, it is necessary in this circuit that the principal have the right of control with respect to the agent.

We must remember that we are considering the contours of the test for agency to be applied in the context of personal jurisdiction. We are not examining the rules governing the test for vicarious liability, or for holding DCAG financially liable for the actions of MBUSA. Moreover, when we consider control here, it is as part of a test that primarily considers whether the services are of "sufficient importance." *See Unocal*, 248 F.3d at 928. Outside the context of personal jurisdiction, we do not require a double showing in order to establish an agency relationship: in other circumstances, the tasks to be performed by the agent on behalf of the principal need not be of any special importance. *See, e.g., Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003); Restatement (Third) of Agency § 1.01.

*3. DCAG's Right to Control*

**[8]** The degree of control that DCAG exercises over MBUSA is more than sufficient for the purpose of establishing personal jurisdiction. To repeat, we must take plaintiffs' alleged facts as true, because plaintiffs need make only a prima facie showing of personal jurisdiction here.

[9] DCAG contends that the General Distributor's Agreement is evidence of an "arms-length" relationship with MBUSA. We do not read the agreement as DCAG appears to. DCAG has the right to control nearly all aspects of MBUSA's operations including: the number of vehicles that MBUSA must sell; the approval of MBUSA's Authorized Resellers, as well as the location of each retail sales outlet, showroom and service facility; the dealership standards that MBUSA must comply with; the business systems that MBUSA uses; the type of customer information that MBUSA must collect; which management personnel are appointed to run MBUSA; which management personnel positions shall exist at MBUSA; the standards and requirements MBUSA must meet for vehicle servicing; whether MBUSA is required to establish a Service Coordination Center, and if so, what tasks that Center will perform; the warranty terms applicable to MBUSA's customers; whether MBUSA can alter or modify any vehicle; what technical service publications MBUSA shall have in its library; the content and scope of MBUSA's advertising and marketing strategy; the type, design and size of MBUSA's signs; the prices that MBUSA must pay to DCAG; the prices that MBUSA may charge to its Authorized Resellers; the working capital level and financing capability level that MBUSA must maintain; what other goods MBUSA may sell or manufacture; whether MBUSA must assist in vehicle homologation; and the sales numbers of various Authorized Resellers. If that exhaustive list were not enough, DCAG also has the right to require MBUSA to execute "*any agreement relating to . . . any other matter related to this Agreement* in the form from time to time adopted by [DCAG]" as long as those new Agreements are not an "unreasonable burden" on MBUSA. (emphasis added). MBUSA must comply with all of DCAG's current requirements and all future requirements that may be set forth in any future document promulgated by DCAG. DCAG also receives notice about nearly all of MBUSA's actions, including personnel changes, customer information, and marketing strategy.

[10] Because MBUSA's services were sufficiently important to DCAG and because DCAG had the right to substantially control MBUSA's activities, we conclude that MBUSA was DCAG's agent for general jurisdictional purposes.

## B. Reasonableness

Because we hold that there is ample evidence of an agency relationship between DCAG and MBUSA, and, thus, that MBUSA's contacts with California may be imputed to DCAG, we now must turn to the second part of our test: whether the assertion of jurisdiction is "reasonable." *See Unocal*, 248 F.3d at 925.

[11] Once plaintiffs have made the requisite showing of minimum contacts in the forum state, "[t]he burden . . . shifts to the defendant to present a *compelling* case that jurisdiction would be unreasonable." *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1198 (9th Cir. 1988) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)) (emphasis added); *see also Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1175 (9th Cir. 2006). We weigh seven factors in resolving this question:

> the extent of purposeful interjection; the burden on the defendant; the extent of conflict with sovereignty of the defendant's state; the forum state's interest in adjudicating the suit; the most efficient judicial resolution of the dispute; the convenience and effectiveness of relief for the plaintiff; and the existence of an alternative forum.

*Sinatra*, 854 F.2d at 1198-99. No one factor is dispositive; nor is the answer dictated by whether the majority of factors favors one side or the other. Rather we take into consideration all seven factors and then conduct an overall evaluation of the question. *See Harris Rutsky*, 328 F.3d at 1132.

## 1. The Extent of Purposeful Interjection

[12] DCAG has purposefully and extensively interjected itself into the California market through MBUSA. The district court found that DCAG had purposely availed itself of the California market, primarily through its design of cars to meet California's air quality standards, its manufacture of a fuel cell for the California Fuel Cell Partnership, and the fact that DCAG built a prototype fuel cell vehicle specifically for the United Parcel Service ("UPS") to use in California. *Bauman I*, 2005 WL 3157472, at *8. The district court also found that DCAG had purposefully interjected itself into California by "initiating lawsuits in California courts to challenge the state's clean air laws and to protect DCAG's patents and other business interests." *Id.* at *13. Moreover, it found that the sale of DCAG's vehicles in California "is not an isolated occurrence but arises from the efforts of DCAG to serve the California market." *Id.* In addition, we note that DCAG established DaimlerChrysler Research and Technology North America and headquartered the company in "the heart of Silicon Valley." Researchers at the Research and Technology Center in Palo Alto have focused on such products as fuel cell vehicles and vehicle-to-vehicle communication for DCAG brands including Mercedes-Benz.

[13] The district court also found it relevant that DCAG has retained permanent counsel in California and is listed on the Pacific Stock Exchange located in San Francisco. *Bauman I*, 2005 WL 3157472, at *8. DCAG also answered a complaint in a different case in the Northern District of California and filed a cross-complaint after waiving service of process. *See id.* (discussing case). Next, the district court found that the patent and clean air DCAG instituted lawsuits were "likely central to DCAG's business functions." *Id.* at 9. Finally, according to DCAG's own figures, MBUSA's sales in California alone account for 2.4% of DCAG's total worldwide sales.

The first factor, therefore, weighs heavily in favor of "reasonableness," as a corporation that "has continuously and deliberately exploited the [California] market . . . must reasonably anticipate being haled into court there . . . ." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984).

## 2.  *The Burden on the Defendant*

The burden on the defendant, a large international corporation, to litigate the case in California is not so weighty as to preclude jurisdiction — particularly since "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." *Sinatra*, 854 F.2d at 1199. In 1990, we held that "[i]n this era of fax machines and discount air travel, requiring the partnership to defend itself in California . . . would not be so unreasonable as to violate due process." *Sher*, 911 F.2d at 1365. Today, for better or for worse, we have moved past that era of fax machines to the current era of electronic-filing in which judges of this court must make a special request if we wish to receive the paper copy of some documents filed with our court. Now, in addition to discount airline travel, parties have the option of conducting video conferences with their clients, and can even, in some instances, conduct video depositions. These technological advances significantly lower the costs, financial and otherwise, of foreign corporations litigating cases in American courts.

[14] Here, the burden on the defendant of producing records and witnesses in California, when the events in question took place in Argentina, would be no greater than if the case were instead litigated in Germany. Moreover, DCAG's official language is English, so it will not be disadvantaged in that respect by litigating in the forum selected by the plaintiffs.

This factor weighs slightly in DCAG's favor, because there is *some* burden in having to litigate in a foreign country. It is

BAUMAN v. DAIMLERCHRYSLER CORPORATION       6587

not, however, a particularly significant factor, in part because the burden for an international corporation is ordinarily slight, and in part because "the Supreme Court has preferred non-jurisdictional methods of lessening the inconvenience faced by defendants." *Sinatra*, 854 F.2d at 1199.

### 3. The Extent of Conflict with Sovereignty of the Defendant's State

Third, we have held that the extent of the conflict with the sovereignty of the defendant's state "is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court." *Id.* (quoting *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir. 1984), *cert. denied*, 471 U.S. 1066 (1985)). Although it is true that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field," *Asahi Metal Indus. v. Superior Court*, 480 U.S. 102, 115 (1987) (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)), that same consideration will always be present in claims under the ATS and the TVPA.

[15] Although German courts have expressed some concern that this suit may impinge upon German sovereignty, we do not agree. In applying this factor, we examine "the presence or absence of connections to the United States in general, not just to the forum state." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993). Here, DCAG "has manifested an intent to serve and to benefit from the United States market." *See Sinatra*, 854 F.2d at 1200. Therefore, "sovereignty considerations weigh less heavily than if no United States-based relationships were established." *Id.* When this suit was filed, nearly 50% of DCAG's overall revenue came from the U.S., and sales of DCAG vehicles in the United States accounted for 1% of this country's GDP. It is obvious that this magnitude of sales requires extensive "relationships" in the United States. In addition to its relationship

with MBUSA discussed at length above, DCAG was the product of a merger between Chrysler and DaimlerBenz AG. One of the products of that merger, the DaimlerChrysler Corporation (DCC), was one of the Big Three automobile companies in the United States at the time the suit was filed. Although DCAG insists that it did not have headquarters in the U.S. and that the employee payroll figures that plaintiffs repeatedly cite refer to DCC employees rather than DCAG employees,[16] we need not decide for the purposes of examining this factor whether this is correct. It is clear that DCAG had a strong general presence in the United States through MBUSA and DCC. It is not an infringement on the corporate form to count DCC as a large asset in the United States that DCAG owned. It is irrelevant whether DCC's employees also counted as employees of DCAG.

DCAG has "manifested an intent to serve and to benefit from the United States market." *Sinatra*, 854 F.2d at 1200. It has chosen to place itself at risk of litigation by engaging in extensive business in the United States through the operations of its agent MBUSA and its asset DCC. We do not violate Germany's sovereignty by exercising jurisdiction to hear this suit, even though it involves a German citizen corporation. This factor again weighs only slightly in DCAG's favor.

### 4.   *The Forum State's Interest in Adjudicating the Suit*

Fourth, although the events at issue did not take place in California and although the plaintiffs are not California residents, the forum state does have a significant interest in adjudicating the suit. California partakes in "the shared interest of the several States in furthering fundamental substantive social

---

[16]A letter from DCAG Chairman Jurgen Schrempp in a DCAG publication, under the headline "Our *Presence* in North America," said that DCAG had 125,000 employees in the United States, Canada, and Mexico. (emphasis added). The same publication said that DCAG paid $8.2 billion in wages in the United States in 2003.

policies." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Here, as the claims are predicated upon the ATS and TVPA, that policy is providing a forum to redress violations of international law by defendants who have enough connections with the United States to be brought to trial on our shores, even though the injury is to aliens and occurs outside our borders — "a small but important step in the fulfillment of the ageless dream to free all people from brutal violence." *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980). American federal courts, be they in California or any other state, have a strong interest in adjudicating and redressing international human rights abuses. As the Second Circuit held shortly after the turn of the century:

> The new formulations of the Torture Victim Protection Act convey the message that torture committed under color of law of a foreign nation in violation of international law is our business, as such conduct not only violates the standards of international law but also as a consequence violates our domestic law. In the legislative history of the TVPA, Congress noted that universal condemnation of human rights abuses provide[s] scant comfort to the numerous victims of gross violations if they are without a forum to remedy the wrong. This passage supports plaintiffs' contention that in passing the Torture Victim Prevention Act, Congress has expressed a policy of U.S. law favoring the adjudication of such suits in U.S. courts.

*Wiwa*, 226 F.3d 88, 106 (2d Cir. 2000) (internal citations and quotation marks omitted).

We agree and have previously cited *Wiwa* with approval for this exact point. *Sarei v. Rio Tinto*, 550 F.3d at 831. The policy of the TVPA is that these "suits should not be facilely dismissed on the assumption that the ostensibly foreign controversy is not our business." *Wiwa*, 226 F.3d at 106. In light of the important interest we have recognized, this factor

weighs in favor of the reasonableness of exercising personal jurisdiction.

## 5.   *The Most Efficient Judicial Resolution of the Dispute*

The fifth factor, which examines which forum is most efficient, "involves a comparison of alternative forums." *Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc*, 1 F.3d 848, 852 (9th Cir. 1993). Because we have primarily looked to where the witnesses and evidence are located in order to determine the most efficient forum, *see, e.g.*, *Core-Vent*, 11 F.3d at 1489, there is no difference between the United States and Germany insofar as this factor is concerned. Here, the witnesses and evidence are located primarily in Argentina. Therefore, if that forum were an available alternative forum as discussed below, it would likely be the most efficient. Of course, if a forum is not an available alternative, it cannot be the most efficient in the "comparison of alternative forums." In any event, "this factor is 'no longer weighed heavily given the modern advances in communication and transportation.' " *Harris Rusty*, 328 F.3d at 1133 (quoting *Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998)). In the end, the factor is a draw; there is no difference insofar as the efficiency factor is concerned between the United States and Germany, and Argentina is not a truly available forum as discussed below.

## 6 & 7.   *The Convenience and Effectiveness of Relief for the Plaintiff; and the Existence of an Alternative Forum*

We have traditionally evaluated the sixth and seventh factors together. *See Core-Vent*, 11 F.3d at 1490. The plaintiffs contend that Germany does not recognize human rights suits against corporate defendants and will not allow equitable tolling. Argentinian courts, the plaintiffs assert, provide no means of redress against corporations that collaborated with Argentine security forces in carrying out the Dirty War, and would bar this suit on account of the statute of limitations. Most

important for our purposes is whether Argentina would be an adequate forum, as that country, where the events at issue in this lawsuit took place, would be the most natural location in which to litigate the case, were all other factors equal. The plaintiff "bears the burden of proving the unavailability of an alternative forum," *Harris Rutsky*, 328 F.3d at 1133-34, although as mentioned earlier, the overall burden with respect to reasonableness lies with the defendants.

[16] The plaintiffs' arguments that Argentina would not be a fully adequate forum — if it is a forum at all — are persuasive, at this stage of the litigation. A recent Supreme Court case in Argentina has held that human rights civil cases arising out of the Dirty War are subject to a two-year and three-month statute of limitations. *See* Corte Supreme de Justicia de la Nacion [CSJN] [National Supreme Court of Justice], 30/10/2007, "Larrabeiti Yanez, Anatole Alejandro y otro c/ Estado Nacional / proceso de concocimiento," La Ley [L.L.] (2008-F-23) (Arg.).[17] This suit would, for that reason, be barred — which makes Argentina unavailable as an alternative forum.[18] *See Bank of Credit and Commerce Int'l, Ltd. v.*

---

[17]DCAG points to a news article about another Argentinian Supreme Court case involving the prosecution of a government official for acts committed during the Dirty War; the article says that "[t]he statute of limitations is not applied to these *crimes*." *Martinez de Hoz Pardon Quashed By Supreme Court*, Buenos Aires Herald (Apr. 28, 2010) (emphasis added). There is no indication, however, that the law regarding civil cases has changed, and therefore this article, even were we to consider it, is of no significance. In fact, the *Yanez* case cited above recognized that crimes against humanity "have no statute of limitations in the *penal sphere*" but rejected an argument that an "action to claim compensation has no statute of limitations." (emphasis added). Rather, the Court found that the two year and three-month statute of limitations from the age of majority applied to claims for compensation.

[18]Even if it were possible to bring suit in Argentina, which appears unlikely in light of *Yanez*, we cannot say that either "efficient judicial resolution of the dispute" or the "convenience and effectiveness of relief for the plaintiff" would likely be achieved. The Department of State has noted "credible allegations of efforts by members of security forces and others

*State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001)
("[A]n adequate forum does not exist if a statute of limitations
bars the bringing of the case in that forum.")

As to Germany, there is conflicting expert testimony about
whether equitable tolling, or an equivalent within the German
legal system, would allow the suit to proceed. The answer is
not clear; indeed, the district court concluded that "it appears
that plaintiffs' claims, which are based on events that
occurred in 1976 and 1977, would not *necessarily* be time-
barred." *Bauman II*, 2007 WL 486389, at *4 (emphasis
added) (citations omitted). DCAG argues that Germany *does*
allow human rights suits against corporate defendants, and
that plaintiffs are incorrect when they assert a contrary posi-
tion. Plaintiffs argue, however, that when DCAG was arguing
before the German courts about the need to stay the plaintiffs'
service of process, DCAG argued that plaintiffs could *not*
allege a cause of action in the German courts.

Furthermore, in *Harris Rutsky*, we considered the defen-
dant's amenability to service of process in the alleged alterna-
tive forum in deciding whether that forum was truly an
alternative. *Harris Rutsky*, 328 F.3d at 1134. Given the con-
cerns discussed above, and the issues that have already arisen
with respect to plaintiffs' efforts to serve DCAG in Germany,
we cannot say that Germany is an adequate forum such that
personal jurisdiction elsewhere should be defeated. Here,
DCAG is not readily amenable to service of process in Ger-
many, *see* footnote 4 *supra*; instead, as discussed above, it has
vigorously fought the plaintiffs' attempts to serve it. For the

---

to intimidate the judiciary and witnesses." U.S. Dep't of State, Argentina,
Country Reports on Human Rights Practices — 2002, at 8 (Mar. 31,
2003). According to plaintiffs, they have already suffered intimidation for
speaking out against Mercedes-Benz Argentina and the security forces,
and it is reasonable to conclude that they might continue to be so intimi-
dated if they were to pursue this litigation in Argentina. Therefore, the bar-
riers to effective relief in Argentina for the plaintiffs are formidable.

reasons stated above, factors six and seven weigh in favor of the plaintiffs with respect to Argentina, but the answer is unclear as to Germany or possibly, because of the burden of proof applicable to the evaluation of this factor, the balance should be struck in favor of Germany.

Even if Argentina and Germany were, as DCAG argues, both adequate fora for redressing any alleged wrongs, the availability of an alternative forum is not the deciding factor in the personal jurisdiction analysis.[19] We are not here considering *forum non conveniens*. "While *forum non conveniens* and personal jurisdiction analyses overlap, they are by no means identical." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1116 (9th Cir. 2002). Rather, the question of an alternate forum is one factor among several that we consider in deciding whether it is *reasonable and fair* to bring DCAG, a foreign corporation with a general agent operating continuously throughout the state of California, before a court in that forum.

### Overall Evaluation of the Factors

[17] The question before us is ultimately whether exercising personal jurisdiction over DCAG comports with fair play and substantial justice. We find that it does. As the Second Circuit held in evaluating the exercise of personal jurisdiction over the Royal Dutch/Shell Group:

> While it is true that certain factors normally used to assess the reasonableness of subjection to jurisdiction do favor the defendants (they are foreign corpo-

---

[19]In fact, we have noted that "[w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable." *Sinatra*, 854 F.2d at 1201 (quoting *Corporate Investment Business Brokers v. Melcher*, 824 F.2d 786, 787 (9th Cir. 1987)) (alteration in original). Here, the defendants have not shown that jurisdiction in the forum state is unreasonable.

rations that face something of a burden if they
litigate here, and the events in question did not occur
in New York), litigation in New York City would
not represent any great inconvenience to the defen-
dants. The defendants control a vast, wealthy, and
far-flung business empire which operates in most
parts of the globe. They have a physical presence in
the forum state [through their agent], have access to
enormous resources, face little or no language bar-
rier, have litigated in this country on previous occa-
sions, have a four-decade long relationship with one
of the nation's leading law firms, and are the parent
companies of one of America's largest corporations,
which has a very significant presence in New York.
New York City, furthermore, where the trial would
be held, is a major world capital which offers central
location, easy access, and extensive facilities of all
kinds. We conclude that the inconvenience to the
defendants involved in litigating in New York City
would not be great and that nothing in the Due Pro-
cess Clause precludes New York from exercising
jurisdiction over the defendants.

*Wiwa*, 226 F.3d at 99.

Many or all of those considerations apply with equal force
in this case. For much the same reasons, we conclude that it
is reasonable to exercise jurisdiction over DCAG in Califor-
nia, a state that has itself become a major hub for world com-
merce and attracts business not only from all over Europe, but
from all over Asia as well.

In *Harris Rutsky*, we found that jurisdiction was reasonable
even though there was an "obvious alternative forum" and the
balance of the seven factors was essentially a wash, "since
some of the reasonableness factors weigh in favor of [the
defendant], but others weigh against it." 328 F.3d at 1134; *see
also Roth*, 942 F.2d at 625 (holding that jurisdiction was rea-

sonable even though only two reasonableness factors favored plaintiff, while three favored defendant). Here, the defendants present a far less compelling case than did the defendants in *Harris Rutsky*. Most important, DCAG's contacts with California and with the U.S. are *far* more extensive than the defendant's contacts in *Harris Rutsky*. In that case, the defendant had "several California-based relationships, including a contractual one with ASR [the purported agent]. After purposefully seeking out a financially lucrative relationship with ASR, [the defendant] communicated with ASR on a regular basis over a four-year period." *Harris Rutsky*, 328 F.3d at 1134. That was the extent of the contacts in *Harris Rutsky*, and yet we ultimately held that "[g]iven the quantity and quality of the contacts with the forum state, it is not unreasonable for a court in California to exercise personal jurisdiction" over the defendant. *Id.*

**[18]** In light of DCAG's pervasive contacts with the forum state through MBUSA, including the extensive business operations of that subsidiary, the interest of California in adjudicating important questions of human rights, our substantial doubt as to the adequacy of Argentina as an alternative forum, and the various issues discussed above with respect to Germany, we hold that DCAG "has not met its burden of presenting *a compelling case* that the exercise of jurisdiction would not comport with fair play and substantial justice." *See id.* (emphasis added).

## V.   Conclusion

At the time this suit was filed, MBUSA's business was sufficiently important to DCAG that without MBUSA or another representative, DCAG would have performed those services itself. Moreover, DCAG had the right to control to one extent or another nearly every aspect of MBUSA's business. Therefore, we conclude that, at least for the limited purpose of determining general jurisdiction, MBUSA was DCAG's agent.

The Supreme Court "long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests" that fail to take account of reality. *Burger King*, 471 U.S. at 478-79 (quoting *Int'l Shoe*, 326 U.S. at 319). The reality is that in an increasingly complex and globalized economy, international corporations such as DCAG reap enormous profits from the sale of their goods in the United States. The sales are achieved through the use of major distributors, frequently in the form of subsidiaries. Many international companies organize their corporate structure and establish subsidiaries for the sole purpose of obtaining the maximum benefit from the American market. To the ordinary American, and certainly to us, it would seem odd, indeed, if the manufacturer of Mercedes-Benz vehicles, which are sold in California in vast numbers by its American subsidiary, for use on the state's streets and highways, could not be required to appear in the federal courts of that state. Mercedes-Benz cars are ubiquitous in California, and Mercedes-Benz dealerships, required to display the signage mandated by DCAG, have a highly visible presence.

The numbers bear out our perception. At the time that this suit was filed, MBUSA's sales in California alone accounted for 2.4% of DCAG's total worldwide sales. Moreover, when considering burdens on the defendant and the issue of state sovereignty, we cannot overlook the fact that when this suit was filed, nearly 50% of DCAG's overall revenue came from the United States, and that in order to make this income, DCAG created a wholly-owned subsidiary, MBUSA, to sell Mercedes-Benz vehicles in the United States.

Our test for personal jurisdiction must take these realities into account in determining whether it is reasonable to subject a parent company to the jurisdiction of the courts of this nation on the basis of the acts of its agent. After applying this test, we have no doubt that DCAG is subject to personal jurisdiction in California, and that the exercise of such jurisdiction is not only reasonable, but fair and just. Therefore we reverse

and remand for further proceedings consistent with this opin-
ion.[20]

**REVERSED and REMANDED.**[21]

---

[20]To the minimal extent that the opinion contains information received
under seal by the district court, the seal is lifted. To the extent that any
other information was received under seal, and has not previously been
made public, the stipulated protective order shall remain in effect.

[21]This opinion replaces the opinion filed on August 28, 2009 and with-
drawn on May 6, 2010.

**United States Court of Appeals for the Ninth Circuit**

**Office of the Clerk**
95 Seventh Street
San Francisco, CA 94103

**Information Regarding Judgment and Post-Judgment Proceedings**
(December 2009)

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

(1)   A.   **Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

B.   **Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
> ► The proceeding involves a question of exceptional importance; or
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)   Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-2.

**(3)   Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)   Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at   under *Forms*.
- You may file a petition electronically via the appellate ECF system.  No paper copies are required unless the Court orders otherwise.  If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper.  No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at   under *Forms*.

## Attorneys Fees
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at   under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari
- Please refer to the Rules of the United States Supreme Court at

## Counsel Listing in Published Opinions
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - ► West Publishing Company; 610 Opperman Drive; PO Box  64526; St. Paul, MN 55164-0526 (Attn: Kathy Blesener, Senior Editor);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

**Form 10. Bill of Costs** ............................................................................................................*(Rev. 12-1-09)*

# United States Court of Appeals for the Ninth Circuit

## BILL OF COSTS

**Note:** If you wish to file a bill of costs, it MUST be submitted on this form and filed, with the clerk, with proof of service, within 14 days of the date of entry of judgment, and in accordance with 9th Circuit Rule 39-1. A late bill of costs must be accompanied by a motion showing good cause. Please refer to FRAP 39, 28 U.S.C. § 1920, and 9th Circuit Rule 39-1 when preparing your bill of costs.

| | v. | | 9th Cir. No. | |

The Clerk is requested to tax the following costs against:

| Cost Taxable under FRAP 39, 28 U.S.C. § 1920, 9th Cir. R. 39-1 | REQUESTED Each Column Must Be Completed | | | | ALLOWED To Be Completed by the Clerk | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Docs. | Pages per Doc. | Cost per Page* | TOTAL COST | No. of Docs. | Pages per Doc. | Cost per Page* | TOTAL COST |
| Excerpt of Record | | | $ | $ | | | $ | $ |
| Opening Brief | | | $ | $ | | | $ | $ |
| Answering Brief | | | $ | $ | | | $ | $ |
| Reply Brief | | | $ | $ | | | $ | $ |
| Other** | | | $ | $ | | | $ | $ |
| | | | TOTAL: | $ | | | TOTAL: | $ |

\* Costs per page may not exceed .10 or actual cost, whichever is less. 9th Circuit Rule 39-1.

\*\* Other: Any other requests must be accompanied by a statement explaining why the item(s) should be taxed pursuant to 9th Circuit Rule 39-1. Additional items without such supporting statements will not be considered.

Attorneys' fees **cannot** be requested on this form.

*Continue to next page.*

**Form 10. Bill of Costs -** *Continued*

I, _____ , swear under penalty of perjury that the services for which costs are taxed were actually and necessarily performed, and that the requested costs were actually expended as listed.

Signature _____

("s/" plus attorney's name if submitted electronically)

Date _____

Name of Counsel: _____

Attorney for: _____

(To Be Completed by the Clerk)

Date _____        Costs are taxed in the amount of $ _____

Clerk of Court

By: _____ , Deputy Clerk